# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 24, 2012 Session

## STATE OF TENNESSEE v. CYNTHIA J. FINCH

### Appeal from the Criminal Court for Knox County
### No. 92216      Jon Kerry Blackwood, Senior Judge

### No. E2011-02544-CCA-R3-CD - Filed November 22, 2013

The Defendant, Cynthia J. Finch, was indicted for one count of fabricating evidence, a Class C felony; one count of forgery of $1,000 or more but less than $10,000, a Class D felony; and one count of forgery of less than $1,000, a Class E felony. See Tenn. Code Ann. §§ 39-14-105, -14-114, -16-503. Following a jury trial, the Defendant was acquitted of the fabricating evidence count and convicted of the two forgery counts. The trial court sentenced the Defendant as a Range I, standard offender to two years to be served on unsupervised probation. In this appeal as of right, the Defendant contends (1) that the statute allowing a district attorney general to specially appoint the attorney general and reporter to conduct specific criminal proceedings violates the Tennessee Constitution; (2) that the evidence was insufficient to sustain the Defendant's convictions; (3) that the trial court erred by excluding evidence of a settlement in a civil lawsuit between the Defendant and Knox County; (4) that the trial court erred in instructing the jury with respect to its definition of "value" and in denying the Defendant's request for an instruction on the rule of cancellation; (5) that the State abused its discretion in denying the Defendant's request for pretrial diversion; (6) that the trial court abused its discretion in denying the Defendant's request for judicial diversion; and (7) that the trial court erred in its determination that the Defendant was not an especially mitigated offender. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., joined. JOSEPH M. TIPTON, P.J., filed a separate opinion concurring in part and dissenting in part.

Robert L. Jolley, Jr., and Jennifer L. Gower, Knoxville, Tennessee, for the appellant, Cynthia J. Finch.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel (on appeal); Michael A. Meyer, Deputy Attorney General (at trial); and William C. Bright, Special Assistant Attorney General (at trial), for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

From September 2002 to February 2008, the Defendant served as the Senior Director of Community Services for Knox County. The Defendant's primary responsibility was to oversee all aspects of the Knox County government that provide direct services to the public, such as the health department, the public libraries, veterans' services, and the community development department. The Defendant supervised approximately 500 employees and reported directly to the Knox County Mayor. Because of her high ranking position in the Knox County government, the Defendant was given a purchasing card, commonly referred to as a "P card."

P cards were issued to certain county employees to be used solely for "business-related purchases." The P cards were intended "to expedite the processing of low dollar purchases" and to lessen the need for petty cash transactions. The cards operated like a personal credit card. Each month the county's finance department would receive a consolidated statement for all of the P cards and would pay the financial institution that had issued the cards from a miscellaneous expenditure account. The cardholders would then review their individual statements and submit receipts or explanations for the expenses to the finance department. The finance department would review these reports and then debit the appropriate expenditure accounts and credit the miscellaneous expenditure account. When a county employee had "inadvertently" made a personal purchase using a P card, the employee would reimburse the county. The Defendant had written checks in the past to reimburse the county for personal expenses charged to her P card.

Each Knox County employee who was issued a P card was required to go through a training program and sign an authorization agreement. The authorization agreement stated that "personal charges" were not to be made to the P card and would be "considered misappropriation of county funds." In addition to this, the policies and procedures manual for the P card program stated that cardholders were to retain all of their receipts and to submit them with their monthly statements to the finance department. If a cardholder did not have a receipt for a specific charge she was to "attach a description of the purchase." The manual further stated that "[c]ontinued incidents of missing documentation [could] result in the cancellation of [an] employee's purchasing card." The Defendant completed the P card

training program and signed an authorization agreement when she was first hired by Knox County.

In May 2007, the Knox County Auditor, Richard Walls, began an internal audit of the P card program at the request of a member of the Knox County Commission. The purpose of the audit was to determine if P card purchases were compliant with the program's polices and procedures and that purchases were "related to Knox County business." The audit focused on the Knox County Mayor and several other high ranking county employees, including the Defendant. Monthly statements for each of the cardholders audited were reviewed, and the purchases listed on the statements were matched with receipts that the cardholders had previously submitted. All of the cardholders audited had purchases where they had not submitted receipts. The auditors prepared a list of purchases missing receipts for each cardholder and sent a copy of the list to the corresponding cardholder.

As pertinent to this review, the following purchases were included in the list of the Defendant's missing receipts:

| Purchase Date | Vendor | Amount |
| --- | --- | --- |
| September 14, 2004 | Kinko's | $6.21 |
| October 12, 2004 | Kinko's | $15.47 |
| October 12, 2004 | Kinko's | $26.92 |
| April 13, 2005 | FedEx Kinko's | $64.00 |
| August 17, 2005 | FedEx Kinko's | $4.86 |
| August 17, 2005 | FedEx Kinko's | $50.07 |
| October 13, 2005 | FedEx Kinko's | $21.85 |
| December 22, 2005 | FedEx SHP | $16.13 |
| October 20, 2006 | FedEx Kinko's | $225.00 |
| November 29, 2006 | FedEx Kinko's | $1,759.00 |
| March 13, 2007 | FedEx Kinko's | $14.28 |
| April 10, 2007 | FedEx Kinko's | $14.38 |

Mr. Walls testified that he gave the cardholders "sufficient time to hunt receipts" and that the cardholders, including the Defendant, would periodically provide the auditors with missing receipts and the lists would be updated. Mr. Walls asked the cardholders to provide the auditors with a description of each purchase if they were unable to locate a missing receipt. On November 19, 2007, Mr. Walls received a memorandum from the Defendant's office. The memorandum was dated November 12, 2007, and was signed by the Defendant. The memorandum set out the Defendant's descriptions for the purchases that were missing receipts. The purchases listed above were described as being for "[o]ffice supplies, postage[,] and copies for departmental activities and events." Under the entry for the $1,759.00 purchase, the memorandum stated that the purchase was for "booklets" for a presentation on teenage pregnancy and prenatal care.

Hugh Holt, the Purchasing Director for Knox County during the audit, testified that his office oversaw the P card program. Mr. Holt testified that in November 2007, the Defendant personally brought a manila envelope containing several receipts to his office. The Defendant told Mr. Holt that "she had found [the receipts] in her mailbox over the weekend" and "alluded that it was one of her former employees that . . . left them there." Mr. Holt told the Defendant to give the receipts to the P card program administrator, Matthew Munafo. Mr. Munafo testified that the Defendant gave him the manila envelope containing the receipts and told him that she found the receipts "either at home or the office." Mr. Munafo then sent the receipts to Mr. Walls's office to be included in the audit.

Mr. Walls testified that on November 29, 2007, his office received a memorandum signed by the Defendant "remitting copies of receipts that [had] been found." Shane Weaver, an auditor in Mr. Walls's office, testified that the memorandum was hand delivered by a woman from the Knox County Mayor's office. Attached to the memorandum were twelve receipts that purported to be from FedEx Kinko's for the purchases previously listed above. When the auditors reviewed the purported FedEx Kinko's receipts "it was pretty obvious" that they were not authentic because they did not look like other FedEx Kinko's receipts they had previously received. Mr. Weaver testified that the FedEx Kinko's logo was in a different place on each of the receipts; there was "a strange line running down the side" of the receipts; each receipt listed only one item, "copies"; and the "quantity of the copies was always one with just a price."

Cindy Catlin, a district manager with FedEx Office, testified at trial that the twelve purported FedEx Kinko's receipts submitted by the Defendant were not authentic. Ms. Catlin testified that FedEx acquired Kinko's in 2004. The company was then renamed FedEx Kinko's and later changed its name to FedEx Office. Ms. Catlin testified that a FedEx Kinko's customer could get a duplicate receipt from the store where they made their purchase for ninety days after the purchase. After ninety days, the customer would have to contact the

corporate office to "data mine" for a copy of the receipt. Ms. Catlin testified that FedEx Kinko's would never authorize another company or person to make a document purporting to be a duplicate receipt.

All twelve of the receipts purported to be from FedEx Kinko's. However, for three of the purchases made in 2004, the vendor was actually Kinko's, not FedEx Kinko's. Ms. Catlin testified that all of the receipts at issue listed "copies" as the item purchased. Ms. Catlin explained that "copies" was not a valid service description at FedEx Kinko's because it did not explain "what services were rendered." Instead, FedEx Kinko's assigned identifying numbers to each service it provided and listed the numbers on its receipts. Ms. Catlin also testified that the logo on the receipts appeared to have been taken from the company's website and did not match the logo that was actually used on the company's receipts at the time.

In February 2008, Mr. Walls held a meeting with the Defendant to discuss the fake FedEx Kinko's receipts. John Troyer, the county finance director, as well as, Clifford Tucker and Bryan Burkland from the office of the Tennessee Comptroller of the Treasury, were also present at the meeting. At the meeting, the Defendant was told that the FedEx Kinko's receipts did not appear to be legitimate. Mr. Burkland testified at trial that the Defendant responded by stating that she was unaware of any discrepancies in the receipts and that they "were proper receipts." The Defendant was asked at the meeting where the receipts had come from. Mr. Tucker testified that the Defendant responded that "she had several people that were helping her come up with the missing [receipts] and that she did not know where [they] came from but she would get them as people came up with them or put them in her inbox."

Mr. Tucker asked the Defendant what the $1,759.00 purchase had been for. Mr. Tucker testified that the Defendant responded "that it was for a health department program brochure that related to teenage pregnancy" and prenatal care. The Defendant gave Mr. Tucker a copy of the brochure. Mr. Tucker testified that the purchase had been made in November 2006, but the brochure the Defendant had given him was dated May 2007 on its cover. When Mr. Tucker pointed out the inconsistency in the dates, the Defendant "really could not explain what the charge was for." Mr. Tucker also pointed out that for one purchase, the P card statement "reflected the charge having included sales tax but the [receipt submitted] did not show sales tax." Another receipt "reflected a charge for copies whereas the [P card] statement indicated it was for shipping." Mr. Tucker testified that the Defendant "could really not explain [these] differences" and that she "just reiterated that she did not get . . . the [receipts] herself."

A short time after the meeting, the Defendant contacted Mr. Tucker to ask him "about responding to any audit findings." The Defendant told Mr. Tucker that "she had a name of a person who had some information about" the fake receipts and told Mr. Tucker to contact a man named Nathan who worked at a local UPS Store. Mr. Burkland testified that in May or June 2008, after the audit report had been issued, the Defendant contacted him and claimed that the $1,759.00 purchase was for programs for the Hardy Torch Scholarship Gala. The Defendant gave Mr. Burkland a copy of the program. Mr. Burkland testified that the P card statement showed the purchase was made on November 29, 2006, and the program was dated November 30, 2006. The P card statement also had a notation by the Defendant next to the charge that stated, "program for client." Mr. Tucker and Mr. Burkland both testified that the Defendant had made no mention of the program at the February 2008 meeting.

A copy of the program was introduced into evidence at trial. The program's cover listed the event as being presented by the "Tennessee Conference Community Development Corporation" (TCCDC), the Knox County Mayor's Office, and the Knox County Health Department. However, the program also made clear that the event and the scholarship were undertakings of the TCCDC and listed the Knox County Mayor's Office as only a "silver" sponsor of the event. The program did thank Knox County for providing the Defendant "and a staff of volunteers to lead and coordinate the event." At trial, defense counsel asked Mr. Burkland if he had investigated "whether the price for the production of [the program] was consistent with the price that was on [the FedEx] Kinko's receipt." Mr. Burkland responded that "[i]t was consistent with a listing of charges we had from [FedEx] Kinko's."

Nathan Mishu testified that he was a manager at a local UPS Store. According to Mr. Mishu, the Defendant was a regular customer in his store, and she did "a lot of shipments" for her sorority at the store. Mr. Mishu recalled that the Defendant had previously spent over $1,000 to ship items from Knoxville to Memphis for her sorority. Mr. Mishu testified that in the fall of 2007, the Defendant was in his store making copies when she asked if she could get duplicate receipts for two previous purchases. Mr. Mishu told the Defendant that if she would give him the amount and the date he would "assume [that] she was tell[ing] [him] the truth" and put the information into an invoice form on his computer to make the duplicate receipts. Mr. Mishu testified that when he told the Defendant this she "got really happy" and told him that she had tried to get duplicate receipts at FedEx Kinko's but that "they would not help her at all."

Mr. Mishu testified that he was surprised that the Defendant could not get duplicate receipts at FedEx Kinko's. According to Mr. Mishu, the Defendant then asked him if there was any way he could print receipts for the FedEx Kinko's purchases she needed receipts for. Mr. Mishu testified that he told the Defendant that the only way he could do that would be to make the receipts using the invoice form for the UPS Store and to then cut and paste the

FedEx Kinko's logo from its website over the UPS Store logo. Mr. Mishu asked the Defendant if that was what she wanted him to do, and she said yes. The Defendant gave Mr. Mishu a list with twelve dates and amounts and asked him to be sure to put her P card number on all of the receipts. Mr. Mishu testified that the Defendant asked him to make the receipts as soon as possible and to fax them to her when he got them done. Mr. Mishu testified that he made the receipts and still had them saved on the computer at his store. Printouts of the computer files introduced at trial showed that the forged receipts were dated November 27, 2007.

Mr. Mishu testified that he faxed the forged FedEx Kinko's receipts to the Defendant the next day. Mr. Mishu called the Defendant and asked if the forged receipts looked okay and were they what she wanted. Mr. Mishu testified that the Defendant told him that they were and thanked him for making the receipts. Mr. Mishu further testified that he did not speak to the Defendant again until February 2008, when she called him and asked him to call her "accountant" and explain to him about the FedEx Kinko's receipts. According to Mr. Mishu, the Defendant "denied everything" and "acted like nothing happened." The phone number the Defendant gave Mr. Mishu for her "accountant" was for John Troyer, the county finance director. Mr. Mishu testified that he tried "to cover up for" the Defendant. Mr. Mishu told Mr. Troyer that he made the receipts and "told [the Defendant] everything," but that she "was busy on the phone and she did not understand [him]." According to Mr. Mishu, the Defendant called him two more times to find out exactly what he had said to Mr. Troyer.

Mr. Mishu testified that he forged FedEx Kinko's receipts to help the Defendant because she had spent so much money in his store. Mr. Mishu also testified that he did not know that the Defendant worked for the county government and that he assumed she worked for a sorority. Mr. Mishu admitted that he had not been charged with any criminal offense for forging the FedEx Kinko's receipts. On cross-examination, Mr. Mishu testified that he could not remember if the Defendant asked for the UPS Store receipts and the FedEx Kinko's receipts on the same day and that he could not explain why the UPS Store receipts were dated October 30, 2007, and the FedEx Kinko's receipts were dated November 27, 2007. Mr. Mishu also testified that he could not remember if he handed the UPS Store receipts to the Defendant or faxed them to her. Additionally, Mr. Mishu could not remember if he faxed the fake FedEx Kinko's receipts to the Defendant the day she asked for them or the next day.

The Defendant presented several witnesses at trial who testified that they had known her for numerous years, that she had a good reputation, and that she was very hardworking and honest. At the conclusion of the trial, the jury acquitted the Defendant on the charge of fabricating evidence and convicted her of forgery of $1,000 or more but less than $10,000

and forgery of less than $1,000. Prior to trial, the State denied the Defendant's request for pretrial diversion. The trial court likewise denied the Defendant's request for judicial diversion. The trial court sentenced the Defendant to two years for the conviction of forgery of $1,000 or more but less than $10,000 and to one year for the conviction of forgery of less than $1,000. The trial court ordered the sentences to be served concurrently for an effective two-year sentence. The trial court then placed the Defendant on unsupervised probation.

## ANALYSIS

*I. Constitutionality of Tennessee Code Annotated Section 8-7-106(b)*

The Defendant contends that Tennessee Code Annotated section 8-7-106(b), allowing a district attorney general to specially appoint the attorney general and reporter to conduct specific criminal proceedings, violates the Tennessee Constitution. The Defendant argues that article VI, section 5 of the Tennessee Constitution provides that only a trial court may appoint a district attorney general pro tempore. The Defendant concludes that her convictions should be overturned and the indictments against her invalidated because the trial court did not appoint the attorney general and reporter as a district attorney general pro tempore for this case. The State responds that there is nothing in article VI, section 5 that prohibits a district attorney general from specially appointing the attorney general and reporter to conduct a specific criminal proceeding.

In May 2008, the District Attorney General for the Sixth Judicial District filed a petition with the trial court requesting an order appointing a district attorney general pro tempore to investigate the allegations against the Defendant. The trial court granted the petition and entered an order appointing Assistant District Attorney General William C. Bright from the Thirtieth Judicial District to serve as district attorney general pro tempore. In August 2008, General Bright filed a motion to vacate the order.

General Bright stated in his motion that the investigation had "grown beyond the original grant of authority" by the trial court. General Bright also stated that the attorney general and reporter had agreed to be specially appointed to undertake the investigation pursuant to Tennessee Code Annotated section 8-7-106(b), but that the order having appointed a district attorney general pro tempore needed to be vacated to "effectuate the appointment" of the attorney general and reporter. The trial court granted General Bright's motion and vacated the order. The district attorney general sent a notice to the trial court that the attorney general and reporter had consented to the special appointment.[1]

---

[1]The attorney general and reporter subsequently appointed General Bright to serve as a special assistant attorney general in this matter.

A district attorney general "is an elected constitutional officer whose function is to prosecute criminal cases in his or her circuit or district." Ramsey v. Town of Oliver Springs, 998 S.W.2d 207, 209 (Tenn. 1999). Article VI, section 5 of the Tennessee Constitution provides that in "all cases" where a district attorney general "fails or refuses to attend and prosecute according to the law, the Court shall have power to appoint an Attorney pro tempore." Tennessee Code Annotated section 8-7-106(a) expands on the power granted to trial courts in article VI, section 5, stating that "[i]f the district attorney general fails to attend the circuit or criminal court, or is disqualified from action, or if there is a vacancy in the office, the court shall appoint some other attorney to supply such district attorney general's place temporarily." "[O]ne of these three situations must occur before a judicial appointment is appropriate." Quillen v. Crockett, 928 S.W.2d 47, 51 (Tenn. Crim. App. 1995).

Notwithstanding the provisions of article VI, section 5 and Tennessee Code Annotated section 8-7-106(a), subsection (b) of 8-7-106 provides that a district attorney general may make special appointments to conduct specific criminal proceedings. As pertinent to this review, subsection (b)(4) provides as follows:

> Upon the consent of the attorney general and reporter, [the district attorney general may] specially appoint the attorney general and reporter, or an assistant to the attorney general and reporter, to conduct specific criminal proceedings, including grand jury proceedings, which the district attorney general is authorized by law to conduct in that district . . . .

Tenn. Code Ann. § 8-7-106(b)(4).

The General Assembly has distinguished special appointments made pursuant to subsection (b) of section 8-7-106 from pro tempore appointments made pursuant to subsection (a), stating as follows:

> The acts of an attorney acting for the district attorney general or the attorney general and reporter pursuant to subsection (b) shall be valid as if done by the regular officer, and there shall be no requirement that the regular officer be disqualified from acting or that there be a vacancy in the office. Nor shall the regular officer be compelled to attend court proceedings in the matters in which an attorney is acting for the regular officer pursuant to subsection (b); provided, that the regular officer may be in attendance, and participate, if such a regular officer so desires.

Tenn. Code Ann. § 8-7-106(c).

Because the office of district attorney general is a constitutional office, the General Assembly "may enact laws prescribing or affecting the 'procedures for the preparation of indictments or presentments,' [but] it cannot enact laws which impede the inherent discretion and responsibilities of the office of district attorney general without violating" article VI, section 5 of the Tennessee Constitution. State v. Superior Oil, Inc., 875 S.W.2d 658, 661 (Tenn. 1994) (footnote omitted) (quoting State v. Taylor, 653 S.W.2d 757, 760 (Tenn. Crim. App. 1983)). To that end, this court has previously held that it was constitutional for the General Assembly to provide district attorneys general with full-time assistant district attorneys general to "serve in whatever capacity is necessary to the function of the office" and to "act in the stead of the [district] [a]ttorney [g]eneral in whatever capacity he is called upon to serve." Taylor, 653 S.W.2d at 760-61.

We believe that Tennessee Code Annotated section 8-7-106(b) does not impede the inherent discretion and responsibilities of the office of district attorney general or the power of trial courts to appoint district attorneys general pro tempore. The power to make special appointments found in section 8-7-106(b) gives district attorneys general flexibility in managing their case loads and allows for the appointment of a special prosecutor in situations where an appearance of impropriety might exist but would not rise to the level of disqualification.

A specially appointed prosecutor does not serve as a district attorney general pro tempore, but, like a full time assistant district attorney general, as the alter ego of the district attorney general. Here, the order appointing a district attorney general pro tempore and the district attorney general's recusal were vacated, allowing the attorney general and reporter to be specially appointed to prosecute this matter. Accordingly, we conclude that section 8-7-106(b) does not conflict with article VI, section 5, that the attorney general and reporter was properly appointed to prosecute this matter, and that this issue is without merit.

*II. Sufficiency of the Evidence*

The Defendant contends that the evidence was insufficient to sustain her convictions. The Defendant argues that the State failed to prove that she intended to defraud or harm Knox County because the FedEx Kinko's receipts had no "legal efficacy." The Defendant further argues that the State failed to prove that the forged receipts had any value. The Defendant also argues that the evidence was insufficient to sustain her convictions because the jury's verdict convicting her of two counts of forgery was inconsistent with its verdict acquitting her of fabricating evidence.

The Defendant further argues that the State failed to prove that she uttered the forged FedEx Kinko's receipts to any Knox County employees. In support of this argument, the

Defendant contends that Mr. Mishu's testimony was the "only evidence suggesting" that she knew the receipts were false. The Defendant argues that because Mr. Mishu was an accomplice to the forgery, his uncorroborated testimony alone could not sustain her convictions. The Defendant further argues that, due to inconsistencies in Mr. Mishu's testimony at trial, the rule of cancellation should have been applied to nullify his testimony.

The State responds that the evidence was sufficient to sustain the Defendant's convictions. The State argues that the Defendant's intent to defraud could be inferred from the circumstances of her conduct and that the evidence was sufficient to establish this element of the offense. The State also argues that there was sufficient evidence to establish the value of the receipts. The State further argues that any inconsistency in the verdicts has no impact upon our review of the sufficiency of the evidence for the two forgery convictions. Finally, the State argues that there was sufficient evidence to establish that the Defendant knew the receipts were false and that she uttered them to employees of Knox County. The State responds that Mr. Mishu's testimony was corroborated by the evidence at trial and that the rule of cancellation does not apply to this case.

*A. Standard of Review*

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Bland</u>, 958 S.W.2d at 659; <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." <u>State v. Cooper</u>, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." <u>State v. Williams</u>, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . [and] [i]f the jury is convinced beyond a reasonable doubt, we can require no more." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The offense of forgery occurs when a person "forges a writing with intent to defraud or harm another." Tenn. Code Ann. § 39-14-114(a). The applicable terms "forge" and "writing" are defined as follows:

> (1) "Forge" means to:
>     (A) Alter, make, complete, execute or authenticate any writing so that it purports to:
>         (i) Be the act of another who did not authorize that act;
>         (ii) Have been executed at a time or place or in a numbered sequence other than was in fact the case; or
>         (iii) Be a copy of an original when no such original existed;
>     (B) Make false entries in books or records;
>     (C) Issue, transfer, register the transfer of, pass, publish or otherwise utter a writing that is forged within the meaning of subdivision (b)(1)(A); or
>     (D) Possess a writing that is forged within the meaning of subdivision (b)(1)(A) with intent to utter it in a manner specified in subdivision (b)(1)(C); and

-12-

(2) "Writing" includes printing or any other method of recording information, money, coins, tokens, stamps, seals, credit cards, badges, trademarks, and symbols of value, right, privilege or identification.

Tenn. Code Ann. § 39-14-114(b).

The crime of forgery does not require "actual receipt of property or services" and is completed regardless of whether the defendant takes anything from the victim. State v. Odom, 64 S.W.3d 370, 372, 374 (Tenn. Crim. App. 2001). Put another way, "forgery is complete by the forgery with fraudulent intent, whether any third person be actually injured or not." Id. at 372 (quoting State v. James, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984)) (quotation marks omitted). Forgeries are punishable using the same grading system used to punish theft offenses. Tenn. Code Ann. § 39-14-105, -114(c). "However, all forgeries are at least Class E felonies because of the extensive possible harm." Tenn. Code Ann. § 39-14-114, Sentencing Comm'n Cmts. This court has previously held that the General Assembly intended to punish forgeries "according to the apparent value of the writing forged." Odom, 64 S.W.3d at 374.

### B. Intent to Defraud or Harm

Intent "can seldom be proven by direct evidence" and may be inferred from the character and "nature of the act [or] from all the circumstances of the case in evidence." State v. Inlow, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000) (citing State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)). During the course of an internal audit to determine whether P card purchases had been compliant with the program's polices and procedures and to ensure that the purchases were "related to Knox County business," the Defendant submitted a memorandum describing the purchases at issue in this case as having been for "[o]ffice supplies, postage[,] and copies for departmental activities and events." The Defendant's memorandum specifically stated that the $1,759.00 purchase had been for "booklets" for a presentation on teenage pregnancy.

Shortly after submitting this memorandum, the Defendant approached Mr. Mishu about forging FedEx Kinko's receipts and provided him with a piece of paper listing the specific dates and amounts to be listed on the receipts. The Defendant told Mr. Mishu she needed the receipts quickly and that the P card number needed to be on each receipt. According to Mr. Mishu, he faxed the forged receipts to the Defendant, and she stated that they were what she wanted. When approached in a February 2008 meeting about the authenticity of the FedEx Kinko's receipts, the Defendant stated that she was unaware of any discrepancies in the receipts and insisted that they "were proper receipts." The Defendant

also denied knowing where the receipts had come from. The Defendant again asserted that the $1,759.00 purchase had been for a booklet about teenage pregnancy.

When it was pointed out that the date on the booklet did not correspond with the date of the purchase, the Defendant "really could not explain what the charge was for." The Defendant also could not explain several other discrepancies between the forged receipts and the information provided on the Defendant's P card statements. Shortly after the meeting, the Defendant contacted Mr. Tucker to ask him "about responding to any audit findings" and, despite previously insisting that she did not know where the receipts had come from, told Mr. Tucker that a man named Nathan who worked at a local UPS Store "had some information about" the forged receipts. After the audit report was issued, the Defendant contacted Mr. Burkland to claim that the $1,759.00 purchase had been for programs for the Hardy Torch Scholarship Gala. The Defendant had made no mention of the program prior to contacting Mr. Burkland. We conclude that the preceding evidence was sufficient for the jury to infer that the Defendant intended to defraud or harm Knox County when she submitted the forged FedEx Kinko's receipts.

The Defendant argues that the forged FedEx Kinko's receipts had no legal efficacy because they "reflected the exact information regarding the . . . purchases contained in the monthly P card statements." The Defendant further argues that the receipts had no legal efficacy because every cardholder audited had missing receipts and receipts "were not required as long as the cardholder submitted explanations for the purchases." Generally, a commercial receipt, like the ones at issue here, "is a writing which evidences a legal transaction." Commonwealth v. Sneddon, 738 A.2d 1026, 1028 (Pa. Super. Ct. 1999). A receipt evidences a contract for the sale of goods or services between a customer and a provider with the amount listed on the receipt setting forth the consideration given for the goods or services. Id. To alter a receipt "is to alter the legal relationship between a buyer and seller." Id.

As specific to this case, receipts served an important accounting function for Knox County's P card program. Mr. Walls testified that receipts were needed to verify and document "the item or service purchased." Cardholders were instructed that they were to submit a receipt for every purchase and that repeated failure to submit receipts would result in the termination of their P card. Furthermore, at the time the forged FedEx Kinko's receipts were submitted, an internal audit was being conducted to determine if any P card charges had been for personal items rather than county business. Cardholders had been instructed that any personal purchases would be considered a misappropriation of county funds and cardholders, including the Defendant, had previously reimbursed Knox County for "inadvertent" personal charges. Purchases lacking a receipt were more likely to be scrutinized for the possibility that they had not been for county business. Accordingly, we

-14-

conclude that the forged FedEx Kinko's receipts had a legal efficacy both generally and as specifically applied to the facts of this case.

## C. Value

The Defendant argues that the State failed to establish that the forged FedEx Kinko's receipts had any value because the purchases had been for "legitimate county business." Specifically, the Defendant argues that the $1,759.00 purchase was for programs for the Hardy Torch Scholarship Gala. We begin by noting that "forgery is complete by the forgery with fraudulent intent," regardless of whether the defendant actually took anything from the victim. Odom, 64 S.W.3d 370 at 372 (quoting James, 688 S.W.2d at 466)). Again, forgeries are punished "according to the apparent value of the writing forged" and using the same grading system used to punish theft offenses. Id. at 374. Generally, a receipt has value "since a buyer, upon returning a receipt to the seller, may receive a refund of monies, a store credit, or goods in kind." Sneddon, 738 A.2d at 1028.

The evidence at trial established that receipts had value within Knox County's P card program. As stated above, using a P card for personal purchases was considered a misappropriation of county funds, and cardholders, including the Defendant, who had made such purchases "inadvertently" had reimbursed the county for those expenses in the past. As Mr. Walls testified, receipts were needed to verify and document that purchases were for legitimate county business. Without a receipt to prove that a purchase was legitimate, a cardholder could owe Knox County the amount of the undocumented purchase. Therefore, the fake FedEx Kinko's receipts had an apparent value of the purchase amounts listed on them.

In support of her argument that the fake receipts had no value because the purchases were for "legitimate county business," the Defendant notes that the Hardy Torch Scholarship Gala was the day after the $1,759.00 purchase was made. The Defendant also points to Mr. Burkland's response when asked if he had investigated "whether the price for the product of [the program] was consistent with the price that was on [the FedEx] Kinko's receipt" that "[i]t was consistent with a listing of charges we had from [FedEx] Kinko's." This evidence does create a plausible inference that the $1,759.00 purchase was for "legitimate county business," but it is not the only plausible inference that may be established by the evidence.

The Defendant told none of the auditors about the Hardy Torch Scholarship Gala program until after the audit report had been released. A copy of the program was introduced at trial. The program thanked Knox County for providing the Defendant "and a staff of volunteers to lead and coordinate event," but nothing in the program stated who supplied or paid for the programs. The program made clear that the event and scholarship were

-15-

undertakings of the TCCDC. While the cover of the program stated that the event was presented by the TCCDC, the Knox County Mayor's Office, and the Knox County Health Department, the Knox County Mayor's Office was listed as only a "silver" sponsor of the event.

Mr. Mishu testified that the Defendant was a regular customer in his store and that she did "a lot of shipments" for her sorority there. In fact, Mr. Mishu was unaware that the Defendant worked for Knox County and believed that she worked for her sorority because she had made so many purchases for her sorority at the UPS Store. Mr. Mishu also recalled that the Defendant had previously spent over $1,000 in his store on a shipment for her sorority. During the audit, the Defendant sent a memorandum to Mr. Walls stating that the $1,759.00 purchase had been for a booklet on teenage pregnancy. When confronted about forged receipts, the Defendant again claimed that the $1,759.00 purchase was for booklets on teenage pregnancy despite the fact that the date on the booklet was inconsistent with the purchase date.

The State was not required to rule out every hypothesis except that of the Defendant's guilt beyond a reasonable doubt. The Defendant's argument here would have this court accept all plausible inferences in her favor while ignoring the plausible inferences arising from the evidence that favored the State. The State presented sufficient evidence to create a plausible inference that the charges represented in the forged receipts were personal and not for "legitimate county business." As recognized by the Dorantes standard, the jury was in a better position than this court to weigh the evidence and decide between the competing plausible theories presented by the State and the Defendant. The mere fact that the jury chose the State's plausible theory over that of the Defendant's does not justify overturning the jury's verdict. So long as the jury's verdict was supported by reasonable inferences drawn from the evidence, we are bound to uphold it against a challenge to the sufficiency of the evidence. See Sisk, 343 S.W.3d at 67. Based upon the foregoing evidence, we conclude that a rational juror could reasonably infer from the evidence presented at trial that the purchases at issue were not for "legitimate county business."

### D. Inconsistent Verdicts

The Defendant argues that her "acquittal [for the charge] of fabrication of evidence is relevant to this [c]ourt's assessment of the evidence regarding" her convictions for forgery. Inconsistent verdicts exist when a jury convicts a defendant of one offense and acquits her of another offense even though "both counts stem from the same criminal transaction." Wiggins v. State, 498 S.W.2d 92, 94 (Tenn. 1973). It has long been held that appellate courts will not disturb seemingly inconsistent verdicts. Id. at 94. Doing so would require inappropriate speculation as to the jury's reasoning. Id. Furthermore, each count in a

multiple count indictment is treated as a separate indictment. Id. at 93-94. As such, in examining the sufficiency of the evidence, we look solely at the evidence regarding the convicting offense. Id. at 94. We will not attempt to divine some hidden meaning from the jury's actions regarding a separate count of the indictment. Accordingly, we conclude that this issue is without merit.

*E. Corroboration of Mr. Mishu's Testimony*

The Defendant argues that the State failed to prove that she knowingly uttered the forged receipts to Knox County employees. In support of this argument, the Defendant contends that Mr. Mishu's testimony was the "only evidence suggesting" that she knew the receipts were false and that his uncorroborated testimony alone could not sustain her convictions. It is well-settled that in Tennessee, "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). An accomplice is one "who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." State v. Ballinger, 93 S.W.3d 881, 887 (Tenn. Crim. App. 2001). Whether there is sufficient corroboration is a determination for the jury. Shaw, 37 S.W.3d at 903.

Our supreme court has described what is required to establish sufficient corroboration as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

Shaw, 37 S.W.3d at 903 (quoting State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)). The corroborative evidence need not be "overwhelming." Id. In fact, "[o]nly slight circumstances are required to corroborate an accomplice's testimony." State v. Griffis, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997).

Here, there was significant evidence corroborating Mr. Mishu's testimony that the Defendant knowingly uttered the forged FedEx Kinko's receipts. Mr. Mishu testified that

the Defendant asked him if he could print receipts for FedEx Kinko's. Mr. Mishu told the Defendant that he would have to use the UPS Store form and then cut and paste the FedEx Kinko's logo from its website onto the forms. The Defendant told Mr. Mishu to do this and gave him a list with the dates and amounts she needed receipts for. The Defendant asked Mr. Mishu to be sure to put her P card number on each receipt, to make the receipts as soon as possible, and to fax them to her office. Mr. Mishu testified that he faxed the receipts to the Defendant the next day and called her to ask if they were what she wanted. According to Mr. Mishu, the Defendant responded that they were and thanked him for making the receipts.

The evidence at trial established that the Defendant hand delivered the forged FedEx Kinko's receipts to Mr. Holt in the purchasing department and Mr. Munafo, the P card administrator. The Defendant sent the receipts to the internal auditors attached with a memorandum which she had signed. The evidence at trial also established that "it was pretty obvious" that the receipts were not authentic FedEx Kinko's receipts. The receipts looked nothing like a FedEx Kinko's receipt; the logo was in a different place on each of the receipts; there was a line running down the side of all of the receipts; each receipt listed only one item, "copies"; and the "quantity of the copies was always one with just a price." Given the clear discrepancies in the receipts, it is highly unlikely that anyone who viewed the receipts would have mistaken them for actual FedEx Kinko's receipts, as the Defendant claimed in her meeting with the auditors.

Furthermore, the computer files used to make the forgeries were still on Mr. Mishu's work computer and printouts of the files were introduced into evidence at trial. These printouts showed that the forged receipts were dated November 27, 2007, corroborating Mr. Mishu's testimony about when the Defendant approached him to make the forgeries. Additionally, Mr. Mishu testified that he made two duplicate UPS Store receipts for the Defendant using the same invoice form he used to make the forged receipts. The Defendant submitted these UPS Store receipts to the auditors in November 2007. The UPS Store receipts, like the forged FedEx Kinko's receipts, listed only one item, copies, and the quantity was just one with a price matching the amount from the P card statement.

Despite repeatedly stating that she did not know where the receipts had come from, the Defendant contacted Mr. Tucker shortly after the February 2008 meeting to tell him that a man named Nathan who worked at the UPS Store "had some information" about the forged receipts. Mr. Mishu testified that the Defendant contacted him in February 2008 asking him to explain to her "accountant" about the FedEx Kinko's receipts. Based upon the foregoing, we conclude that there was sufficient evidence to corroborate Mr. Mishu's testimony that the Defendant knew the FedEx Kinko's receipts were forged when she submitted them to the auditors and P card administrators.

*F. Rule of Cancellation*

Finally, the Defendant argues that Mr. Mishu's testimony "should have been stricken pursuant to the rule of cancellation." The Defendant contends that Mr. Mishu's testimony "as to when and how the [FedEx Kinko's] receipts were requested and delivered" was "contradictory and essentially incoherent." In support of this argument, the Defendant notes that Mr. Mishu originally testified that she requested the UPS Store and FedEx Kinko's receipts on the same day. However, during cross-examination Mr. Mishu testified that the Defendant requested the UPS Store receipts prior to asking him to forge the FedEx Kinko's receipts. Later during the cross-examination, Mr. Mishu testified that he could not remember exactly when the Defendant had requested the UPS Store receipts because it had occurred over two years before the trial. The Defendant also notes that Mr. Mishu testified that he had faxed the UPS Store receipts to her but later testified that he was unsure if he faxed those receipts or handed them to her in the store.

Tennessee courts have recognized the rule of law, commonly referred to as the cancellation rule, "that contradictory [sworn] statements made by a witness as to the same fact can cancel each other out." State v. Caldwell, 977 S.W.2d 110, 118 (Tenn. Crim. App. 1997) (citing Taylor v. Nashvill Banner Publ'g Co., 573 S.W.2d 476, 482 (Tenn. Ct. App. 1978)). This is because when "the proof of [a] fact lies wholly with one witness, and he both affirms and denies it," then there is no "evidence at all to prove the fact." State v. Matthews, 888 S.W.2d 446, 449-50 (Tenn. Crim. App. 1993) (quoting Johnston v. Cincinnati N.O. & T.P. Ry. Co., 240 S.W. 429, 436 (Tenn. 1922)). "However, this rule applies only when inconsistency in a witness's testimony is unexplained and when neither version of his testimony is corroborated by other evidence." Caldwell, 977 S.W.2d at 118.

Here, any inconsistencies in Mr. Mishu's testimony were explained by the fact that these events had occurred two years before the trial. Mr. Mishu testified that he had trouble remembering the exact dates and how he gave the UPS Store receipts to the Defendant due to the passage of time. Additionally, it is clear from the record that Mr. Mishu and defense counsel had significant trouble understanding each other during the cross-examination. Furthermore, the UPS Store receipts were dated October 30, 2007, while the printouts from Mr. Mishu's work computer showed that the forged FedEx Receipts had been made on November 27, 2007, corroborating the version of Mr. Mishu's testimony that the Defendant had requested the UPS Store receipts first. Accordingly, we conclude that this issue is without merit.

*III. Admissibility of Civil Settlement*

The Defendant contends that the trial court erred by excluding evidence of a settlement in a civil lawsuit between the Defendant and Knox County. The Defendant argues that this evidence was relevant to show that there was no intent to defraud or harm Knox County because she "did not pay money to Knox County for any P card purchases as part of the settlement." The State responds that the trial court did not abuse its discretion and that the evidence was not relevant because the settlement involved "other extraneous claims . . . beyond the issues raised in this case."

Shortly after the February 2008 meeting regarding the forged FedEx Kinko's receipts, Knox County filed a lawsuit against the Defendant in which it sought to retain the "amount of accrued annual leave compensation" owed to the Defendant as compensation for personal charges the Defendant allegedly made using her P card. The Defendant filed a counter suit raising several claims, including wrongful termination as well as racial and gender discrimination. The Defendant and Knox County entered into a settlement, memorialized in a "mutual release of all claims," in which Knox County agreed to pay the Defendant for her "accrued annual leave compensation" and attorney's fees. The Defendant paid nothing to Knox County as a result of the settlement. When the Defendant sought to introduce this evidence at trial, the trial court ruled that it was not relevant.

A determination regarding the relevancy of evidence "is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn.1997)). Tennessee Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402.

The State was not required to prove that the Defendant actually took anything from Knox County in order to convict her of forging the FedEx Kinko's receipts. See Odom, 64 S.W.3d at 374. The quantum of proof required for the State to obtain the forgery convictions differed greatly from the quantum of proof that would have been required for Knox County to prove that the Defendant had misappropriated county funds. As such, Knox County's decision to settle the civil lawsuit without receiving a payment from the Defendant cannot necessarily be equated with doubt on Knox County's part as to whether the Defendant uttered the forged receipts with the intent to defraud or harm the county.

Furthermore, the decision by a party to a civil suit to enter into a settlement is typically based upon consideration of more than just the strength of the legal claims. Other factors, such as a desire to avoid protracted and complex litigation or negative publicity, can be just

as important, or more, to a party's decision to settle. Here, the Defendant had brought several counter claims against Knox County which, as the State notes, were extraneous to the issues raised in the criminal case. It is extremely likely that Knox County's decision to enter into a settlement was based on these claims, or its desire to avoid addressing these claims, without regard to the allegations that the Defendant had misused her P card. Accordingly, we conclude that the trial court did not abuse its discretion in excluding the evidence of the settlement between the Defendant and Knox County.

## IV. Jury Instructions

### A. Value

The Defendant contends that the trial court erred by instructing the jury on the definition of "value" because the State failed to prove that the forged FedEx Kinko's receipts had any value. The State responds that the trial court did not err by providing the jury with a "legally accurate definition" of "value."

Once more, forgery is punishable using the same grading system used to punish theft offenses. Tenn. Code Ann. § 39-14-105, -114(c). For a forgery to be classified as a Class D felony, the apparent value of the forged writing must be $1,000 or more but less than $10,000. Tenn. Code Ann. § 39-14-105(a)(3). As such, the apparent value of the forged writing is an essential element of the Class D felony of forgery.

Defendants have a constitutional right to a correct and complete charge of the law. State v. Guy, 165 S.W.3d 651, 659 (Tenn. Crim. App. 2004) (quoting State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Therefore, the trial court "has a duty to give a complete charge of the law of the offense included in the indictment, without any request on the part of the defendant to do so." State v. Walker, 29 S.W.3d 885, 893 (Tenn. Crim. App. 1999). The trial court is required to describe and define all of the elements of each offense included in the indictment. Guy, 165 S.W.3d at 659 (citing State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989)). "Any omission in the instructions in reference to an element of the offense which might lessen the burden of proof placed upon the [S]tate is constitutional error and requires a new trial unless the error is harmless beyond a reasonable doubt." Id. (citing Walker, 29 S.W.3d at 893-94)).

The apparent value of the forged writing was an essential element the State had to prove with respect to the count regarding the $1,759.00 purchase in order for that offense to rise to the level of a Class D felony. Therefore, the trial court was required to instruct the jury on the definition of "value." Defense counsel's belief that the State failed to prove the apparent value of the forged writing did not alleviate the trial court of its duty to provide a

correct and complete charge of the law. Instead, that was a question of ultimate fact to be decided by the jury. Accordingly, we conclude that this issue is devoid of any merit.

## B. Rule of Cancellation

The Defendant contends that the trial court erred by denying her request for a special jury instruction on the rule of cancellation. The State responds that such an instruction was not warranted. "When the trial court gives instructions that correctly, fully, and fairly set forth the applicable law, it is not error to refuse to give a special requested instruction." State v. Brooks, 277 S.W.3d 407, 412 (Tenn. Crim. App. 2008) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995)).

We note that the Defendant's written request for the special jury instruction is not in the appellate record. In any event, the trial court provided the jury with thorough instructions which correctly, fully, and fairly set forth the applicable law, including instructions on accomplice corroboration, assessing the credibility of witnesses, and impeachment of witnesses. As such, the trial court did not err in declining to give the Defendant's requested instruction. Furthermore, as we discussed above, the rule of cancellation did not apply to this case because the inconsistences in Mr. Mishu's testimony were explained and a version of his testimony was corroborated by other evidence. Accordingly, we conclude that this issue is without merit.

## V. Pretrial Diversion

The Defendant contends that the State abused its discretion in denying her request for pretrial diversion. The Defendant argues that the State improperly held her "refusal to admit guilt against her." The Defendant further argues that the State failed "to give any meaningful consideration to [her] exemplary role as a respected, hardworking, and charitable member of the community." The State responds that it did not hold the Defendant's "refusal to admit guilt against her" and that it considered and weighed all of the necessary factors in making its determination to deny pretrial diversion.

In a thorough and detailed letter signed by the attorney general and reporter dated August 24, 2010, the State denied the Defendant's request for pretrial diversion. As a preliminary matter, the State noted that the Defendant "did not respond appropriately" when asked to provide a "recitation of the facts of the offense." The State determined that the Defendant's answer that she had "given previous statements to investigators and agents of" the Tennessee Bureau of Investigation was "not responsive" and that it would proceed "on the assumption that [she] had no additional favorable information to provide."

The State concluded that the Defendant's prior criminal history, family history, and social history all weighed in favor of granting diversion. In addressing the Defendant's social history, the State noted that she had "been active in a range of community and other charitable activities for most, if not all, of [her] adult life" and that most of these activities had "been directed toward improving conditions for the poor, aged[,] and other vulnerable members of the community." The State concluded that the Defendant's education neither weighed in favor of diversion or against it because, while the Defendant was "well-educated," "[a] person of [her] education should have been aware of the wrongfulness" of her conduct.

The State determined that the nature of the offenses, the need for deterrence, the ends of justice, and the best interest of the public all weighed against granting the Defendant pretrial diversion. The State then weighed all of the above mentioned factors "in evaluating whether [the Defendant was] amenable to correction." The State concluded that the Defendant's "family background, educational level, and community involvement should have instilled in [her] a sense that it was morally wrong to tender false documents to auditors," but that "[n]one of these prevented [her] from committing the acts of dishonesty for which [she was] charged."

The State then noted that "[t]he situation [was] further aggravated by the absence of any expressions of regret or remorse about this situation in [the Defendant's] application for [pretrial] diversion or at any other time." The State concluded, "after balancing all of the relevant factors," that the nature of the offenses, the need for deterrence, and "the interests of justice and the public outweigh[ed] the significant factors that would [have] otherwise justif[ied] granting pretrial diversion." The Defendant filed a petition for a writ of certiorari challenging the State's denial which was ultimately denied by the trial court.

Pretrial diversion is an "'extraordinary relief' within the exclusive discretion of the prosecuting attorney" and available only to qualified defendants. Stanton v. State, 395 S.W.3d 676, 685 (Tenn. 2013). The parties agree that the Defendant was qualified for pretrial diversion. See Tenn. Code Ann. § 40-15-105(a)(1)(B)(i) (2007). However, eligibility for pretrial diversion "does not give rise to a presumption of entitlement to pretrial diversion." Stanton, 395 S.W.3d at 685. In exercising its discretion, the State has a duty to focus "on a defendant's amenability for correction" and to consider "all of the relevant factors, including evidence that is favorable to a defendant." State v. Bell, 69 S.W.3d 171, 178 (Tenn. 2002).

The relevant factors to be considered by the State are as follows: (1) the circumstances of the offense; (2) the defendant's criminal record; (3) the defendant's social history; (4) the physical and mental condition of the defendant when appropriate; and (5) the likelihood that

pretrial diversion will "serve the ends of justice and the best interests of both the public and the defendant." State v. Hammersley, 650 S.W.2d 352, 355 (Tenn. 1983). The circumstances of the offense and the need for deterrence "cannot be given controlling weight unless they are of such overwhelming significance that they [necessarily] outweigh all other factors." Stanton, 395 S.W.3d at 686 (alterations in original) (quoting State v. McKim, 215 S.W.3d 781, 787 (Tenn. 2007)).

When the State denies a request for pretrial diversion, "the denial must be in writing and must enumerate the factors considered with a factual basis provided for each factor and the weight accorded to each factor." Stanton, S.W.3d at 686. We review the State's decision to deny pretrial diversion for an abuse of discretion. Id. The State abuses its discretion "by failing to consider and articulate all relevant factors, by considering and unduly relying upon an irrelevant factor, or by making a decision that is unsupported by substantial evidence." Id. at 686-87 (emphasis added). On appellate review, we focus on the State's "methodology rather than the intrinsic correctness" of its decision; therefore we do "not engage in re-weighing the evidence considered by" the State. McKim, 215 S.W.3d at 788.

The Defendant argues that the State improperly considered her "refusal to admit guilt." In support of this argument, the Defendant relies upon the portion of the denial letter addressing her answer to the request to provide a "recitation of the facts of the offense." The Defendant contends that the State's decision to proceed "on the assumption that [she] had no additional favorable information to provide" evidenced the State's intention to hold her "refusal to admit guilt" against her. However, as the State notes in its brief, this portion of the denial letter merely indicated that the State would rely on information regarding the facts of the offenses that it already possessed in its analysis of the pretrial diversion application because the Defendant had declined to provide any additional factual information.

The Defendant also argues that the statement regarding an "absence of any expressions of regret or remorse" by her further illustrated the State's decision to hold her "refusal to admit guilt" against her. A defendant is not required to admit guilt as a prerequisite for pretrial diversion. Stanton, 395 S.W.3d at 688. "However, there is a critical distinction between confessing guilt to a crime and accepting responsibility for wrongful conduct." Id. As such, "a defendant's unwillingness to admit wrongdoing and assume responsibility for his or her actions is relevant in assessing a defendant's amenability to correction and whether pretrial diversion will satisfy the need for deterrence and serve the ends of justice." Id. at 689. The statement at issue did not hold the Defendant's "refusal to admit guilt" against her, but rather reflected the State's proper consideration of the Defendant's unwillingness to admit wrongdoing and assume responsibility for her actions. Furthermore, even if it had been an irrelevant factor, there was no evidence that the State unduly relied upon it. See id. at 687 n.2.

The Defendant further argues that the State failed "to give any meaningful consideration to [her] exemplary role as a respected, hardworking, and charitable member of the community." In support of this argument, the Defendant relies upon the portion of the denial letter which stated that her "family background, educational level, and community involvement should have instilled in [her] a sense that it was morally wrong to tender false documents to auditors." However, the denial letter clearly addressed the Defendant's reputation in the community and her charitable work in its conclusion that the Defendant's social history favored pretrial diversion.

It was proper for the State to consider the fact that the Defendant committed the offenses despite having such a positive "family background, educational level, and community involvement" when balancing the relevant factors and addressing her amenability to correction. Essentially, the Defendant's argument asks this court to re-weigh the relevant factors to place more weight on those in her favor than the State chose to place. This court does not engage in re-weighing the evidence considered by the State. Having determined that the State considered and articulated all relevant factors, including the Defendant's positive social history, in its denial letter, we conclude that the State did not abuse its discretion in denying pretrial diverson.

*VI. Judicial Diversion*

The Defendant contends that the trial court abused its discretion in denying her request for judicial diversion. The Defendant argues that there was no substantial evidence to support the trial court's decision. The State responds that the trial court addressed all of the relevant factors and that there was substantial evidence to support the trial court's decision; therefore, the trial court did not abuse its discretion in denying the Defendant's request for judicial diversion.

In addressing the Defendant's request for judicial diversion, the trial court concluded that she was amenable to correction and that her lack of a criminal history, social history, and mental and physical health all weighed "heavily in her favor." With regards to the circumstances of the offenses, the trial court noted that the Defendant held "an extremely high position in public government." The trial court stated that the offenses were an attempt by the Defendant "to escape responsibility" during a "well publicized" audit "of extreme public importance."

The trial court characterized "the actual issuance of [the] false receipts [as] almost laughable in [the] sophomoric or bungling manner in which [it was] performed." However, the trial court found that the Defendant had "exploited" Mr. Mishu and that this conduct was especially egregious because it placed a person, who the trial court believed had no

-25-

"culpability in this case," into "public ridicule." With respect to the deterrence value to the Defendant and others, the trial court noted that there had been "a rash of instances where public officials [were] not upholding the public trust that [was] place[d] in them" and that offenses like the Defendant's "erode[d] the confidence that our people have in public officials."

The trial court continued by stating that the public had "a right to expect [its] public officials" to be honest and that government officials at "the top ought to be more responsible than [those at] the bottom." The trial court opined that the Defendant might have been "singled out because she was the most inept and she[ had] covered [her abuse of her P card] up laughably in this case." The trial court stated that it was not "fair" that other Knox County employees had abused their P cards without being punished. However, the trial court concluded that given the circumstances of the offenses, that the Defendant had been a public official, that she had been in a high ranking position in the government with oversight over several hundred employees, and that she had "betrayed" the public trust, judicial diversion was not "in the best interest of the public and [would not] serve the ends of justice."

There is no dispute that the Defendant was eligible for judicial diversion. See Tenn. Code Ann. § 40-35-313(a)(1)(B) (2007). The decision to grant judicial diversion lies within the discretion of the trial court and will not be disturbed on appeal unless it is shown that the trial court abused that discretion. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). We may not revisit the issue so long as the record contains any substantial evidence to support the trial court's action. Id. The decision should be based on whether the grant of diversion will serve the ends of justice for both the public and the defendant. State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App. 1997).

When making a determination regarding judicial diversion, the trial court must consider the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's mental and physical health, and (6) the deterrent effect of the sentencing decision to both the defendant and other similarly situated defendants. Lewis, 978 S.W.2d at 566. The record must reflect that the trial court considered and weighed all these factors in arriving at its decision. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998).

The trial court must also explain on the record "why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others." Id. (citing State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993)). However, "[t]he denial of judicial diversion may be based solely on the nature and circumstances of the offense, so long as all of the other

relevant factors have been considered, and this factor outweighs all others that might favorably reflect on the [d]efendant's eligibility." State v. George William King, No. M2001-02026-CCA-R3-CD, 2002 WL 31520648, at *4 (Tenn. Crim. App. Nov. 13, 2002) (citing State v. Curry, 988 S.W.2d 153, 158 (Tenn. 1999)).

The record reflects that the trial court considered and weighed all of the required factors in arriving at its decision. The trial court explained on the record why it denied the Defendant's application for judicial diversion and explained why the circumstances of the offense and the deterrence value to others outweighed the other factors. The trial court relied heavily upon the fact that the Defendant abused a position of public trust. This court has previously held that "public officials are called upon to act in accordance with a higher standard than that applied to an average citizen." State v. Rufus Steven Johns, No. M2002-00599-CCA-R3-CD, 2002 WL 31894619, at *3 (Tenn. Crim. App. Dec. 31, 2002), perm. app. denied, (Tenn. June 2, 2003). Accordingly, we conclude that the trial court did not abuse its discretion in denying the Defendant's request for judicial diversion because there was substantial evidence to support that decision.[2]

## VII. Especially Mitigated Offender

The Defendant contends that the trial court erred in its determination that she was not an especially mitigated offender. The Defendant argues that the trial court should not have applied the enhancement factor that she abused a position of public trust because there was no evidence that her position of public trust "was abused by the commission of the offense" due to the fact that the "record [was] devoid of any proof [she] acted with intent to defraud or harm Knox County." Essentially, the Defendant raises this issue in an attempt to reargue her contentions on the sufficiency of the evidence. The State responds that the evidence established that the Defendant had abused a position of public trust when she committed the offenses; therefore, she could not be an especially mitigated offender.

We review "sentences imposed by the trial court within the appropriate statutory range . . . under an abuse of discretion standard with a presumption of reasonableness." State v. Bise, 380 S.W.3d 682, 709 (Tenn. 2012) (internal quotation marks omitted). A sentence will be upheld "so long as the statutory purposes and principles [of the Sentencing Reform Act] . . . have been properly addressed." Id. at 706. On appeal, the burden is on the defendant to

---

[2]The Defendant also argues that the trial court abused its discretion because it denied her request for judicial diversion but had previously granted diversion to a former criminal court judge. In reviewing a trial court's denial of judicial diversion, we examine only the facts and circumstances with respect to the case at hand and not the wisdom of the trial court's decision when judged against the trial court's decisions regarding other defendants.

show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.

A trial court may find a defendant to be an especially mitigated offender if the defendant has no prior felony convictions and the trial court "finds mitigating, but no enhancement factors." Tenn. Code Ann. § 40-35-109(a). Here, the trial court found that the Defendant abused a position of public trust "in a manner that significantly facilitated the commission or the fulfillment of the offense." Tenn. Code Ann. § 40-35-114(14). The Defendant concedes that "she was a public official in a position of public trust." However, the Defendant contends that she did not abuse her position because there was no evidence she acted with intent to defraud or harm Knox County.

An argument regarding the application of enhancement factors to a defendant's sentence is not a proper vehicle to challenge the sufficiency of the convicting evidence. We have previously concluded that the evidence was sufficient to sustain the Defendant's convictions. The enhancement factor that the Defendant had abused a position of public trust was shown by the evidence. As such, the trial court did not abuse its discretion in concluding that it applied to the Defendant's sentence. Because there was an applicable enhancement factor, the Defendant did not qualify as an especially mitigated offender. Accordingly, we conclude that the trial court did not abuse its discretion in rejecting the Defendant's request to be sentenced as an especially mitigated offender.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE