# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
May 29, 2019 Session

## STATE OF TENNESSEE v. DEDRICK LAMONT LINDSEY

### Appeal from the Criminal Court for Hamilton County
### No. 291139, 292276, 272531     Don W. Poole, Judge

_____

### No. E2018-01502-CCA-R3-CD

_____

Defendant, Dedrick Lamont Lindsey, appeals the trial court's order revoking his probation and imposing his sentence. Defendant argues: (1) that the State failed to present "any substantial evidence" to support the trial court's finding that Defendant violated his probation; (2) that the trial court erroneously admitted a witness's recorded statement to police; and (3) that he received ineffective assistance of counsel at the probation revocation hearing. Following a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

Daniel J. Ripper and Calli Kovalic (on appeal), Chattanooga, Tennessee; and Robin Flores and Brandon Raulston (at hearing), Chattanooga, Tennessee, for the appellant, Dedrick Lamont Lindsey.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Neal Pinkston, District Attorney General; and Cameron Williams and Crystle Carrion, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## Factual and Procedural Background

On November 19, 2009, Defendant pled guilty to possession of cocaine for resale, possession of a controlled substance for resale, tampering with evidence, possession of drug paraphernalia, and assault in case number 270295, for which the trial court imposed an effective five-year sentence that was suspended to supervised probation following the service of eleven months and twenty-nine days in jail.[1] Additionally, Defendant pled guilty to aggravated assault in case number 272531. Pursuant to a plea agreement, the trial court sentenced Defendant to four years suspended to supervised probation after the service of eleven months and twenty-nine days in jail. The trial court ordered the sentence in case number 272531 to run consecutively to Defendant's five-year sentence in case number 270295.

On February 15, 2011, the trial court issued a probation violation warrant in case number 272531, alleging that Defendant violated his probation by being arrested on new charges, testing positive for marijuana, and failing to pay fees, court costs, and fines. On March 18, 2013, the trial court entered an order in case number 272531, revoking Defendant's probation to time served and returning Defendant to probation.

On December 9, 2013, the trial court issued a probation violation warrant in case number 270295 and 272531, alleging that Defendant tested positive on a drug screen, failed to report to probation, was arrested on new charges, was unemployed, and failed to pay court costs, fines, and fees.

On March 19, 2014, the Hamilton County Grand Jury indicted Defendant on charges of resisting arrest, possession of drug paraphernalia, possession of a controlled substance, possession of marijuana for resale, possession of cocaine for resale, and tampering with evidence, in case number 291139. On March 27, 2014, the State probation office filed an amended probation violation report in case number 272531, alleging that Defendant had been arrested on multiple new charges.

Thereafter, on July 23, 2014, the Hamilton County Grand Jury indicted Defendant for possession of cocaine for resale, possession of marijuana for resale, possession of alprazolam for resale, aggravated assault, possession of drug paraphernalia, and resisting arrest, in case number 292276. On December 4, 2014, the trial court revoked

---

[1] The indictment and judgment forms for case number 270295 are not included in the record on appeal. Based on the trial court's ruling in the instant probation revocation proceedings, it appears that case number 270295 is not at issue on appeal.

- 2 -

Defendant's probation in case number 272531 and ordered Defendant to serve eleven months and twenty-nine days in jail before returning to probation. The following day, Defendant pled guilty to attempted possession of cocaine for resale in case number 291139 and received a sentence of six years suspended to supervised probation after the service of eleven months and twenty-nine days in jail. The trial court ordered the six-year sentence to run consecutively to the sentence in case number 272531. Defendant additionally pled guilty to attempted possession of cocaine for resale, possession of alprazolam for resale, and aggravated assault in case number 292276. The trial court sentenced Defendant to a total effective sentence of six years suspended to supervised probation; the trial court ordered the sentence to run consecutively to the sentence in case number 291139.

On April 25, 2017, the trial court issued a probation violation warrant in case numbers 272531, 270295, 291139, and 292276, alleging that Defendant had been arrested on new charges, had no valid address, and had absconded from supervision. At the time of the violation warrant, Defendant had a total effective sentence of sixteen years' probation, as follows:

| Case Number | Date of Conviction | Effective Sentence | Concurrent/Consecutive |
|---|---|---|---|
| 270295 | 11/19/09 | 5 years | |
| 272531 | 11/19/09 | 4 years | Consecutive to 270295 |
| 291139 | 12/5/14 | 6 years | Consecutive to 272531 |
| 292276 | 12/5/14 | 6 years | Consecutive to 291139 |

### *State's Proof*

At the beginning of Defendant's probation revocation hearing, trial counsel asserted that the State had failed to provide him with color photographs from a photographic line-up shown to witness Regina Orr. When the prosecutor stated that discovery was provided in January 2018, trial counsel explained that he was provided with "dark copies" of the photographs. He stated, "I get copies of copies of what's in the discovery." The following exchange then occurred:

THE COURT: Did you get color copies or not?

[TRIAL COUNSEL]: I did not get color copies.

[PROSECUTOR] WILLIAMS: There was a link provided to [trial counsel] back in January of 2018 that had all of the evidence in the master case file.

- 3 -

[TRIAL COUNSEL]: Your Honor, . . . this link that the State is starting to use now, it doesn't open up well. It goes to a redirected page, you can't get to it.

The trial court instructed the State to provide to trial counsel "today whatever he doesn't have then on the link."

Following a recess, trial counsel made the following announcement:

[TRIAL COUNSEL]: Judge, I just wanted to correct a representation on the record. The State and I [went] back and forth about discovery. They were saying January 18th, I looked at that. By way of explanation there has been some issues with email and our office . . . but still in all, on 1/18 they did send an email . . . . I did a search and it went into spam. The odd part about it is that I answered that, looks like I answered it thank you from my iPhone, so I did want to correct that that the State did send that material.

THE COURT: You were concerned about the colored photos?

[TRIAL COUNSEL]: Yes, Your Honor.

THE COURT: I am glad both of you brought that up. That's fine.

Regina Orr testified that, on the evening of March 24, 2017, she was sitting in the passenger side of her car, which was parked on Rawlings Street. Her cousin, Jermichael Wright, was sitting in the driver's seat. Ms. Orr explained that Mr. Wright "jumped out" of the car and began arguing with "Dinky," whom she identified as Defendant. Ms. Orr stated that she could see Defendant from where she was sitting but that she did not recall seeing Defendant with a gun. Ms. Orr recalled speaking to Detective Daryl Slaughter about the incident while she was in the hospital. She remembered the detective asking her if Defendant had a gun, but she could not recall her response. She testified that she did not recall telling Detective Slaughter that Defendant fired a gun at her. Ms. Orr explained that she woke up on March 25 in the hospital, where the doctor explained to Mr. Orr that she was paralyzed from her "lower bottom down." Ms. Orr explained that her paralysis was "incomplete"; she had "feeling" but was not able to move.

Ms. Orr testified that she was reluctant to testify at the probation revocation hearing. She stated that she was scared of Defendant because of "threats" she had received from him. The following exchange between the State and Ms. Orr then occurred:

- 4 -

Q. Ms. Orr, are you afraid to speak out against [Defendant] because you saw him the night that you were shot?

A. Yes.

Q. Was [Defendant] the one who shot you that day?

A. Yes.

Ms. Orr stated that she did not see Defendant with a gun but stated that neither she nor Mr. Wright had a gun that night, and no one else was present at the time of the shooting. Ms. Orr recalled that she spoke to Detective Slaughter on two occasions. She recalled that he asked who shot her, and Ms. Orr recalled that she told the detective that Defendant shot her. She did not recall telling Detective Slaughter that she saw Defendant pull out a gun and pull the trigger. Ms. Orr reiterated that Defendant was the individual that shot her.

On cross-examination, Ms. Orr agreed that, from March 2017 until May 2017, she was using prescribed medications "quite heavily" for her condition. She agreed that she took oxycodone, Percocet, and valium but could not recall taking morphine. Ms. Orr denied that she was bipolar and denied telling hospital staff that she was suicidal. She further denied using drugs on the night of the offense. She stated that the first time she saw Defendant was on the day she was shot. She stated that Mr. Wright told her they were going to meet "Dinky." She explained that she saw Defendant standing about ten feet away on the sidewalk "when [they] pulled up." She explained that she was shot under her left arm. She stated that she was on medication on May 12, 2017, when she viewed the photographic line-up but that she was no longer taking morphine and valium.

Detective Daryl Slaughter of the Chattanooga Police Department testified that on March 24, 2017, he was notified of the shooting on Rawlings Street. Detective Slaughter learned that both Mr. Wright and Ms. Orr were shot; Mr. Wright was taken to Parkridge Hospital, and Ms. Orr was taken to Erlanger Hospital. The detective first spoke to Mr. Wright. He then went to Erlanger and attempted to speak to Ms. Orr; however, she was heavily medicated and was having a CT scan, and he could not speak to her at that time. He visited Ms. Orr several other times at Erlanger but was unable to interview her because she was still heavily medicated.

Detective Slaughter explained that, on May 12, 2017, he went to Health South, where Ms. Orr was sent for rehabilitation, and interviewed her there. Regarding the interview on May 12, Detective Slaughter stated:

Yes, we had a great conversation, even spoke to her nurse, made sure she was able and went in there and I record[ed] the interview. She was able to tell me details and was very alert.

Detective Slaughter testified that Ms. Orr was aware that she was being recorded. During the interview, Mr. Orr told Detective Slaughter that she was shot while sitting in the passenger side of her vehicle. She explained that she was paralyzed from the waist down. Ms. Orr said that "Dinky" shot her. Ms. Orr told Detective Slaughter that she had seen him with a gun and that she was able to see him from where she sat in the car. Detective Slaughter stated that he was able to link the nickname "Dinky" to Defendant. He then put together a photographic line-up containing Defendant's photograph, and a patrol officer showed it to Ms. Orr. Ms. Orr identified Defendant from the line-up as the person who shot her.

The State then introduced Ms. Orr's recorded audio statement given to Detective Slaughter at Health South on May 12, 2017. On the recording, Ms. Orr identified her shooter as "Dinky" and said that she had seen him before. She thought he was not shooting at her, but at her cousin, Mr. Wright. She did not know why he was shooting at Mr. Wright but said that was what she had heard. Ms. Orr emphasized that she had seen Dinky, not simply heard that he was the one who shot her. She stated that she saw him pull the gun out and pull the trigger. Ms. Orr said that she was "one hundred percent positive" he was the one who shot her. She was able to say where she was and give her security code for Health South.

As Ms. Orr's recorded statement played, the following colloquy occurred:

[TRIAL COUNSEL]: Same objections I made earlier prior to. This is different than refreshing his recollection of the statement.

THE COURT: I think the State seeks to . . . introduce this under Rule 26, prior inconsistent statements of a testifying witness. Apparently it's an audio recording of that so the [c]ourt has to determine whether this was trustworthy and whether it would be admissible or not but that determination will be made.

. . . .

[TRIAL COUNSEL]: . . . There was quite a bit of hearsay from Ms. Orr leading up to this point. So if I lodge an objection, hearsay from Ms. Orr as far as admissibility of this, the substance of her statements to this [c]ourt.

- 6 -

THE COURT: I am going to allow the statement to be played. It was some hearsay but I think he's leading into the pertinent part of the questioning, so I'll allow the tape to be played. But your exceptions are noted.

. . . .

[TRIAL COUNSEL]: There was, Judge. We are starting to go into -- at this point it sounds like he is just doing an investigation, an investigative summary about something a lot more than who shot me. He is giving editorializations, sounds like he is coaching the witness by saying I want to do everything I can for you. Then it goes into stuff about gang activity.

. . . .

THE COURT: [Trial counsel], I am going to let her play it and we will determine the relevancy or probative value or not at that time.

[PROSECUTOR] WILLIAMS: If there is any mention of any gangs, that [Defendant] be involved in gangs, we'd ask the [c]ourt to disregard that if there is a mention of it.

THE COURT: [Trial counsel] sought to do it and I think it was objected to and sustained.

. . . .

[PROSECUTOR] WILLIAMS: It is not our purpose in playing the statement to put gang affiliation from any of the parties in front of the [c]ourt.

THE COURT: So is that what happens with the rest of the recording though or not?

[PROSECUTOR] WILLIAMS: No.

THE COURT: Okay. Go ahead and play it then.

(Audio being played).

[TRIAL COUNSEL]: Your Honor, I am going to have to continue to object. I may be jumping up and down like a Jack-in-the-Box or Wackamol or whatever, but I don't see how any of this is even relevant.

THE COURT: I think she is beginning to testify about why the shooting took place, so I think that would be relevant and probative. I'll overrule your objection.

(Audio being played).

[TRIAL COUNSEL]: Your Honor, I've got to continue to lodge an objection. I don't see how in the world his editorializations –

THE COURT: Well, what he has talked about, [Mr. Wright] about, I'll sustain if that's what the tape shows.

[TRIAL COUNSEL]: We are going far, far afield as to what –

[PROSECUTOR] WILLIAMS: I think we got in what was inconsistent with her testimony today. I think she indicated that she did not see a gun and it is clear in the statement that she says she is a hundred percent certain that she saw Dinky pull out a gun and then shoot her. I think really that's all we intended to play. So if the Court --

THE COURT: I have heard what her testimony is and the recording, so I'm satisfied with that.

[PROSECUTOR] WILLIAMS: Sure. So we will end the recording at this time.

Christina Barnes with the Tennessee Department of Correction, Probation and Parole testified that she reviewed Defendant's record and his prior probation violations but that she did not supervise him. Ms. Barnes explained that, in December 2014, Defendant pled guilty to aggravated assault and received a four-year sentence in case number 272531. He pled guilty to attempted possession of cocaine for resale and was sentenced to six years in case number 291139, which the trial court ordered to run consecutively to case number 272531. Defendant then pled guilty to attempted possession of cocaine for resale, possession of alprazolam for resale, and aggravated assault in case number 292276 and received an effective six-year sentence that was ordered to run consecutively to the sentences in Defendant's prior cases. Ms. Barnes stated that Defendant had a total effective sentence of sixteen years' probation. Ms.

Barnes explained that a violation of probation was filed against Defendant in February 2011, and the trial court revoked Defendant's probation in March 2013. Defendant was returned to probation, but a second violation was filed in December 2013, which was amended in March 2014. The trial court sustained the second violation and returned Defendant to probation after the service of eleven months and twenty-nine days in jail.

### *Defendant's Proof*

Tanisha Clark, Defendant's sister, testified that she was living with Defendant in an apartment on Harley Lane in April 2017. Ms. Clark explained that Defendant was living at the apartment while he was on probation and that his probation officer came to the residence one time, but she was not present for any home visits by the probation officer in March 2017. Ms. Clark stated that she thought Defendant was reporting frequently to his probation officer but that she did not take him to any probation appointments. Ms. Clark testified that her nephew, Dedrick Lindsey, Jr., went by the nickname "Dinky" or "Little Dinky[.]" However, she stated that Defendant did not go by the nickname "Dinky." She explained that her nephew was now incarcerated. Following Ms. Clark's testimony, the trial court continued the hearing in order to "look at all the facts and all the things we've heard" and to hear arguments from counsel.

Defendant then recalled Ms. Barnes, who testified that April 4, 2017, had been Defendant's scheduled report date. She explained that Defendant had a scheduled home visit the following day, April 5, 2017, but that no one answered the door at Defendant's residence. However, Ms. Barnes acknowledged that there had been "some issue about whether [Defendant] lived at 5050 Harley or 5051."

### *Trial Court's Ruling*

Following the argument of counsel, the trial court ruled as follows:

So before the [c]ourt for consideration as to whether or not [Defendant] has violated the probation are three cases totaling sixteen years. . . .

Now, in regard to whether or not [Defendant] has violated the conditions of probation, we heard from Ms. Regina Orr who testified in a wheelchair, she is paralyzed from the waist down, that a shooting did occur on March 24, 2017. She was in a car on Rawlings Street with another individual, Jermichael Wright, that an argument ensued on that date and then an individual that she indicated in yesterday's hearing was [Defendant] did in fact shoot her, although she was somewhat hazy about all the

circumstances at that time. The case has in fact been set for hearing on several occasions when Ms. Orr was not present. She did indicate that she met with Detective Slaughter later and gave a statement.

Let me indicate initially I didn't quite understand where the State was going in asking about inconsistent or prior statements and then the State did indicate that they were relying on prior inconsistent statement of a testifying witness under Rule 26, Chapter 803 about hearsay exceptions. In regard to that, I think the [c]ourt does need to make a ruling concerning the acceptance of that testimony and I'll discuss that in just a moment. So she indicates at that time that some difficulty in remembering exactly what happened. The State did ask her about giving a statement to Detective Slaughter earlier which was somewhat inconsistent which she admitted or agreed to.

Next we heard from Detective Daryl Slaughter with the Chattanooga Police Department, Major Crimes, for two years. He indicated he was involved in the investigation of the shooting on March 24, 2017. Two individuals were shot, Ms. Orr was shot, Mr. [] Wright was shot. Both went to different hospitals. He did go on two occasions to interview [Ms.] Orr at Erlanger Hospital and determined that she was too heavily medicated and he gives credible proof of seeing her and seeing what condition she was in at that time. He did go back, however, on May 12, 2017 at Health South Rehab and interviewed her again and took an audio statement which came into evidence as Exhibit 1 of the testimony. Based upon his testimony and based upon what I heard on the audio statement, she clearly answered questions at that time. She was very clear about what happened, about a shooting that did take place on the evening that she testified about earlier.

Now, in regard to Rule 26 under the hearsay exceptions of 803, the law indicates that prior inconsistent statements may be admitted as substantive evidence in certain very limited situations. In this situation there was an audio statement taken, presented in court as Exhibit 1. I do find in regard to that and based upon her testimony and her appearance in court yesterday, it has been established by a preponderance of the evidence that that statement was given under circumstances indicating trustworthiness. I do think other guidelines for discussions about prior inconsistent statements ha[ve] been met. So I do consider the audio recording taken by Detective Slaughter as substantive evidence. Detective Slaughter gave very credible evidence that on the two occasions she was not able to talk to him but on this occasion she was and based upon what I

heard yesterday, this statement was trustworthy, it was an audio recording very clearly heard at that time.

We also heard from Christina Barnes, probation and parole officer, the liaison with the courts that she had reviewed [Defendant's] record about prior violations.  He has been before the [c]ourt on two prior occasions for violating the conditions of probation.   She indicates possibly that [Defendant] absconded because two visits were made to the home on Harley Lane, 5050 Harley Lane.  There is some apparent misunderstanding about where he did live.  I will find there is some evidence that maybe [Defendant] didn't give his correct address.  I did hear from his sister who explained that she lived with him at 5050-B Harley Lane and she did receive some notification that the probation officer had been there and [Defendant] did go down a short while thereafter and reported to the probation officer.  Shortly thereafter he was arrested.  I don't give a lot of weight to the fact that he absconded.

I do give a great deal, overwhelming weight by the preponderance of the evidence, I do find that [Defendant] on the date in question of March 24, 2017, did assault, severely injure [Ms.] Orr who is now paralyzed from the waist down, that he did possess a weapon, that he was convicted with a prior drug offense possessing that weapon and he did possession a deadly weapon in regard to that.

So I do find, once again, by a preponderance, if not overwhelming evidence[,] that he has violated the conditions of probation.

The trial court revoked Defendant's probation and imposed his sentences in case numbers 272531, 291139, and 292276.

### *Motion to reconsider*

At a hearing on August 15, 2018, the trial court heard Defendant's pro se motion to reconsider.  Defendant claimed that he did not have discovery relating to his probation violation before the hearing.  He argued, "I wasn't able to use it at the probation hearing. If you would have had . . . to hear the evidence, I would have been able to . . . show you that the witnesses were lying under oath.  I have statements that were in the discovery that will show you that they did lie they testified falsely, but I wasn't able to produce that because I didn't have that at the time."  Defendant claimed that he did not receive discovery until two days after the probation revocation hearing.  Prosecutor Williams responded, "Well, that's actually not true.  The discovery was provided in January of

2018 and he had it for settlement." The trial court overruled Defendant's motion to reconsider. This timely appeal follows.

## Analysis

### 1. Evidence of probation violation

On appeal, Defendant contends that the State failed to present "any substantial evidence" to support the trial court's finding that Defendant shot Ms. Orr. He contends that the only proof offered was two contradictory statements by a single witness and that Ms. Orr's recorded statement was unreliable because the witness was under the influence of heavy medication and because the statement was taken nearly two months after the shooting. Defendant further asserts that the statement offered was unreliable because it was not based on Ms. Orr's personal knowledge but was based on what other individuals told her. The State responds that the record contains substantial evidence supporting the trial court's revocation decision.

Upon a finding by a preponderance of the evidence that a defendant has violated a condition of his or her probation, a trial court may revoke probation and order the imposition of the original sentence. Tenn. Code Ann. §§ 40-35-310, -311 (2018); *State v. Kendrick*, 178 S.W.3d 734, 738 (Tenn. Crim. App. 2005) (citing *State v. Mitchell*, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991)). We will not disturb the trial court's ruling on appeal absent an abuse of discretion. *State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001) (citing *State v. Harkins*, 811 S.W.2d 79, 82 (Tenn. 1991)). To establish an abuse of discretion, a defendant must show that there is "no substantial evidence" in the record to support the trial court's determination that a violation of probation has occurred. *Id.* Proof of a violation does not need to be established beyond a reasonable doubt. *State v. Milton*, 673 S.W.2d 555, 557 (Tenn. Crim. App. 1984). Rather, if a trial court finds by a preponderance of the evidence that a violation has occurred, the court may revoke the probation and suspension of the sentence. Tenn. Code Ann. § 40-35-311(e) (2018).

Proof of a probation violation is sufficient if it allows the trial judge to make a conscientious and intelligent judgment. *State v. Gregory*, 946 S.W.2d 829, 832 (Tenn. Crim. App. 1997). "In probation revocation hearings, the credibility of witnesses is for the determination of the trial judge." *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980) (citing *Bledsoe v. State*, 387 S.W.2d 811, 814 (Tenn. 1965)). The findings of fact made by the trial court are to be given the weight of a jury verdict. *State v. Lewis*, 917 S.W.2d 251, 257 (Tenn. Crim. App. 1995). Those findings are binding on this court unless the evidence preponderates otherwise. *Id.*

Here, at the conclusion of the probation revocation hearing, the trial court found by a preponderance of the evidence that Defendant had violated the conditions of probation. The trial court found that on March 24, 2017, Defendant shot and severely injured Ms. Orr, resulting in her paralysis from the waist down, and that Defendant possessed a weapon. The trial court explained that Ms. Orr testified that "[s]he was in a car on Rawlings Street with another individual, Jermichael Wright, that an argument ensued on that date and then an individual that she indicated . . . was [Defendant] did in fact shoot her, although she was somewhat hazy about all the circumstances at that time." The trial court found that on May 12, 2017, Ms. Orr met with Detective Slaughter, gave him a statement, and identified Defendant in a photographic line-up as the individual who shot her. Regarding Ms. Orr's recorded statement, the trial court determined, "Based upon [Detective Slaughter's] testimony and based upon what I heard on the audio statement, [Ms. Orr] clearly answered questions at that time. She was very clear about what happened, about a shooting that did take place on the evening that she testified about earlier."

Upon review, we discern no abuse of discretion by the trial court. Following Defendant's arrest on new charges of aggravated assault, felon in possession of a weapon, and possession of a firearm while in commission of a dangerous felony, the trial court issued a probation violation warrant based, in part, on Defendant's failure to obey the laws of the state. At the probation revocation hearing, Ms. Orr testified that, on the evening of March 24, 2017, she was sitting in the passenger side of her car, which was parked on Rawlings Street. Ms. Orr explained that Mr. Wright "jumped out" the car and began arguing with "Dinky," whom she identified as Defendant. Ms. Orr explained that Defendant shot her, resulting in her paralysis from her "lower bottom down." Ms. Orr stated that she did not see Defendant with a gun, but she also stated that neither she nor Mr. Wright had a gun that night and that no one else was present at the time of the shooting. Ms. Orr recalled that she spoke to Detective Slaughter on two occasions. She recalled that he asked who shot her and that she told the detective that Defendant shot her. However, Ms. Orr did not recall telling Detective Slaughter that she saw Defendant pull out a gun and pull the trigger.

Detective Slaughter testified that he responded after the shooting of Ms. Orr and Mr. Wright on Rawlings Street on the night of March 24, 2017. He explained that he went to Erlanger Hospital and attempted to speak to Ms. Orr on several occasions, but he was unable to interview her because she was heavily medicated. Detective Slaughter explained that, on May 12, 2017, he went to Health South, where Ms. Orr was sent for rehabilitation, and interviewed her there. Regarding the interview on May 12, Detective Slaughter stated, "[W]e had a great conversation, even spoke to her nurse, made sure she was able and went in there and I record[ed] the interview. [Ms. Orr] was able to tell me details and was very alert." Detective Slaughter testified that Ms. Orr said that "Dinky"

- 13 -

shot her. She told Detective Slaughter that she had seen him with a gun and that she was able to see him from where she sat in the car. Detective Slaughter stated that he was able to link the nickname "Dinky" to Defendant. He then put together a photographic line-up containing Defendant's photograph, and a patrol officer showed it to Ms. Orr. Ms. Orr identified Defendant from the line-up as the person who shot her.

*a. Cancellation rule*

Defendant argues that the record does not contain substantial evidence supporting the conclusion reached by the trial court "because the only proof offered was contradictory statements" by Ms. Orr and "[c]ontradictory statements of a witness in connection with the same fact have the result of cancelling each other out." The State responds that the "cancellation rule" does not apply to Defendant's case. The State argues that the contradiction between Ms. Orr's unsworn statement to Detective Slaughter and her sworn hearing testimony created "only a prior inconsistent statement governed by Rule 613, not two sworn statements governed by the cancellation rule."

"Tennessee courts have recognized the rule of law, commonly referred to as the cancellation rule, 'that contradictory [sworn] statements made by a witness as to the same fact can cancel each other out.'" *State v. Finch*, 465 S.W.3d 584, 603-04 (Tenn. Crim. App. 2013) (alteration in original) (quoting *State v. Caldwell*, 977 S.W.2d 110, 118 (Tenn. Crim. App. 1997)). "This is because when the proof of [a] fact lies wholly with one witness, and he both affirms and denies it, then there is no evidence at all to prove the fact." *Id.* at 604 (alteration in original) (quoting *State v. Matthews*, 888 S.W.2d 446, 449-50 (Tenn. Crim. App. 1993) (internal quotation marks omitted). "Tennessee courts have uniformly applied the [cancellation] rule in those instances in which a witness's *sworn* statements are contradictory." *State v. Michael Dwayne Edwards*, No. W1999-00591-CCA-R3-CD, 2000 WL 674671, at *3 (Tenn. Crim. App. May 16, 2000) (emphasis in original) (quoting *State v. Roger Dale Bennett*, No. 01C01-9607-CC-00319, 1998 WL 909487, at *5-6 (Tenn. Crim. App. Dec. 31, 1998), *perm. app. denied* (Tenn. 1999)) (internal quotation marks omitted), *perm. app. denied* (Tenn. Dec. 4, 2000).

Here, Ms. Orr's hearing testimony was not contradictory in itself. Although her testimony was inconsistent in many respects with earlier statements that she made to Detective Slaughter, Ms. Orr's earlier statements were unsworn and, thus, not subject to the cancellation rule. Ms. Orr was consistent—in her hearing testimony and in her statement to Detective Slaughter—that she was sure Defendant shot her. This consistent fact was, as the State says, "the most damning part of Ms. Orr's testimony." Defendant has failed to show that there is "no substantial evidence" in the record to support the trial court's determination that a violation of probation occurred.

## b. Reliability of Ms. Orr's recorded statement

Defendant also attacks the reliability of Ms. Orr's recorded statement. He contends that the statement was unreliable "due to Ms. Orr's heavily medicated state" and because, in the two months following the shooting, "other people had been telling Ms. Orr that [Defendant] was the individual who shot her." The State responds that the trial court properly found the recorded statement reliable and that the proof does not preponderate against the trial court's credibility determination.

Detective Slaughter testified that he sought to interview Ms. Orr on prior occasions while she was still in the hospital but that he did not do so because he could recognize that she was too heavily medicated. However, when he visited Ms. Orr at the rehabilitation center on May 12, 2017, Detective Slaughter had a "great conversation" with Ms. Orr, and he testified that she was "very alert" and able to recount details of the shooting. The trial court accredited this testimony from Detective Slaughter. Moreover, in the recorded statement, Ms. Orr demonstrated that she was alert and aware. She identified Defendant as the shooter without coaching or hesitation, and she told Detective Slaughter that she had actually seen Defendant and did not simply hear from others that he was the assailant. The proof does not preponderate against the trial court's determination the recorded statement was reliable.

## c. Imposition of original sentence

Once a trial court has determined that a violation of probation has occurred, the court has the discretionary authority to order the defendant to: (1) incarceration; (2) have the defendant serve the original sentence; (3) modify the conditions of the defendant's probation; or (4) extend the defendant's probation period for up to two additional years. *See* Tenn. Code Ann. §§ 40-35-308(a), -308(c), -310, -311(e) (2018); *State v. Hunter*, 1 S.W.3d 643, 648 (Tenn. 1999). The determination of the proper consequences of the probation violation embodies a separate exercise of discretion. *State v. Reams*, 265 S.W.3d 423, 430 (Tenn. Crim. App. 2007).

In this case, the trial court concluded that the proper consequence for Defendant's violation of probation was the execution of Defendant's sixteen-year sentence after finding that Defendant "ha[d] been before the [c]ourt on two prior occasions for violating the conditions of probation." Ms. Barnes testified that a violation of probation was filed against Defendant in February 2011, and the trial court revoked Defendant's probation in March 2013. Defendant was returned to supervised probation, but a second violation was filed in December 2013, which was amended in March 2014. The trial court sustained the second violation and returned Defendant to probation after the service of eleven months and twenty-nine days in jail. It is clear from the record that Defendant has

continued to violate the terms of his probation and that the trial court's prior attempts to bring Defendant into compliance through periods of incarceration were unsuccessful. The trial court's decision to impose Defendant's sixteen-year sentence is fully supported by the record and was not an abuse of discretion. Defendant is not entitled to relief.

## 2. Admission of Ms. Orr's recorded statement

Defendant asserts that the admission of Ms. Orr's recorded statement violated his due process rights because: (a) it did not qualify as admissible "reliable hearsay"; (b) Defendant did not receive the recorded statement prior to the hearing; and (c) the recorded statement contained hearsay within hearsay. The State responds that the trial court properly admitted the recorded statement as reliable hearsay and that Defendant is not entitled to relief based on his claims that the State failed to provide the recorded statement to him prior to the probation revocation hearing and that the statement contained hearsay within hearsay. The State additionally argues that Ms. Orr's hearing testimony that Defendant shot her provided "all the proof that was necessary to find a probation violation by a preponderance of the evidence" and that Ms. Orr's recorded statement related "wholly to an ancillary issue—whether the victim saw [Defendant] draw a gun and shoot her." Moreover, the State notes that this "ancillary issue" was proven through other evidence.

In matters of probation revocation, defendants are not entitled to "the full panoply of procedural safeguards associated with criminal trial" but nonetheless "must be afforded due process in the revocation proceeding." *State v. Wade*, 863 S.W.2d 406, 408 (Tenn. 1993) (quoting *Black v. Romano*, 471 U.S. 606, 613 (1985)) (internal quotation marks omitted). The United States Supreme Court set forth the minimum due process requirements for probation revocation proceedings in *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973). Those requirements include: (1) written notice of the allegation; (2) disclosure of adverse evidence; (3) an opportunity to be heard and present witnesses and evidence; (4) a conditional opportunity to cross-examine witnesses; (5) "an independent decision maker"; and (6) a written statement from the decision maker regarding evidence relied upon and the reasons for revocation. *Gagnon*, 411 U.S. 786.

"Strict rules of evidence do not apply at revocation hearings." *Lewis*, 917 S.W.2d at 257 (citing *Practy v. State*, 525 S.W.2d 677, 680 (Tenn. Crim. App. 1974); *Barker v. State*, 483 S.W.2d 586 (Tenn. Crim. App. 1972)). "Reliable hearsay has been held admissible in a probation revocation hearing so long as the defendant had a fair opportunity to rebut the evidence." *Id.* (citing *State v. Carney*, 752 S.W.2d 513 (Tenn. Crim. App. 1988)). In order for hearsay evidence to be deemed admissible, a trial court must find that "good cause" exists to justify the denial of the right to confront witnesses and that the hearsay evidence is reliable. *Wade*, 863 S.W.2d at 409.

Defendant asserts that Ms. Orr's recorded statement did not qualify as reliable hearsay because the State made several misrepresentations and/or omissions regarding the contents of the statement when presenting it to the trial court. As noted by the State, however, Defendant made several objections to the admission of the recorded statement but did not object on the ground that the State failed to disclose the precise nature of the recorded statement to the trial court before it was played. "It is elementary that a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason in this [c]ourt[.]" *State v. Adkisson*, 899 S.W.2d 626, 635-36 (Tenn. Crim. App. 1994). Defendant has waived consideration of this claim.

Moreover, Defendant has not established the need for plain error review. *See State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007) (stating that "[i]t is the accused's burden to persuade an appellate court that the trial court committed plain error"). First, Defendant was not denied the right to confront the witness against him by the trial court's admission of the recorded statement. Ms. Orr was available and testified at the probation revocation hearing. *See State v. Larry Huskey*, No. 03C01-9107-CR235, 1992 WL 113412, at *2 (Tenn. Crim. App. May 28, 1992) ("[The witness] testified and was cross-examined extensively. There was no denial of the right to confront witnesses.").

Additionally, the trial court properly concluded that the recorded statement was "reliable hearsay" as it was admissible under Tennessee Rules of Evidence 613 and 803(26). Rule 613 provides, in relevant part, that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b). This court has stated that extrinsic evidence of a prior inconsistent statement is appropriate if the witness denies or does not recall making the statement or if the witness "equivocates about making it." *State v. Ackerman*, 397 S.W.3d 617, 638 (Tenn. Crim. App. 2012). Ordinarily, "prior inconsistent statements offered to impeach a witness are to be considered only on the issue of credibility, and not as substantive evidence of the truth of the matter asserted in such statements." *State v. Reece*, 637 S.W.2d 858, 861 (Tenn. 1982). However, Tennessee Rule of Evidence 803(26) governs the admissibility of a prior inconsistent statement as substantive evidence and provides, as follows:

> A statement otherwise admissible under Rule 613(b) if all of the following conditions are satisfied:

(A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

(B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26). The Advisory Commission Comments clarify that "only prior inconsistent statements, and not consistent statements, are within the ambit of this rule." Tenn. R. Evid. 803(26), *Advisory Comm'n Cmts*.

Here, Ms. Orr testified at the revocation hearing and was cross-examined extensively on the statement to Detective Slaughter. The statement was an audio recording, and the trial court determined by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness. Thus, each of Rule 803(26)'s requirements were met. Once the statement qualified for the hearsay exclusion of Rule 803(26), it was admissible as substantive evidence. Under Rule 613(b), extrinsic evidence of a prior inconsistent statement is appropriate if the witness "denies or does not recall making the statement" or if the witness "equivocates about making it." The State did not seek to introduce Ms. Orr's prior inconsistent recorded statement until she equivocated about whether she told Detective Slaughter that she saw Defendant pull out a gun and fire at her. In the recorded statement, however, Ms. Orr stated that she saw Defendant draw a gun and pull the trigger. She said she was "one hundred percent sure" she saw Defendant pull the gun out and shoot at Mr. Wright and was "one hundred percent positive" that Defendant was the one who shot her.

The trial court did not abuse its discretion by concluding that Ms. Orr's recorded statement qualified as "reliable hearsay." Defendant is not entitled to relief on this claim.[2]

---

[2] We note that, in addition to Ms. Orr's testimony, Detective Slaughter testified that he spoke with Ms. Orr, and she told him Defendant shot her and that she saw him with a gun. Detective Slaughter testified to these facts prior to the admission of Ms. Orr's recorded statement, and Defendant has not attacked the admission of this testimony on appeal. Thus, even if the recorded statement was improperly admitted, it was cumulative to Detective Slaughter's testimony. Admission of incompetent evidence that is cumulative of competent evidence is more likely to be found harmless. *See State v. Lawrence Taylor III*, No. W2015-01693-CCA-R3-CD, 2016 WL 4576044, at *13 (Tenn. Crim. App. Aug. 31, 2016)

*b. Failure to provide the recorded statement to Defendant before hearing*

Defendant argues that his right to due process was violated when the State failed to disclose the adverse evidence against him. He asserts that he did not receive the recorded statement prior to the revocation hearing. This claim, however, is not supported by the record. At the revocation hearing, trial counsel claimed that he had not been provided the statement, but the prosecutor was adamant that the State had provided the statement. Before a recess, the trial court instructed the State to provide to trial counsel "today whatever he doesn't have[.]" Following the recess, trial counsel agreed that he had been provided discovery by the State in an email sent January 18, 2018, which presumably would have contained the victim's statements to police. At best, it is unclear from the record whether the State provided Ms. Orr's statement in advance of the revocation hearing. Defendant simply failed to create a record that would support his claim of a due process violation. He is not entitled to relief on this ground.

*c. Hearsay within hearsay*

Tennessee Rule of Evidence 805 provides that "[h]earsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules or otherwise by law." Tenn. R. Evid. 805. Defendant contends that Ms. Orr's recorded statement contained hearsay within hearsay. He asserts that Ms. Orr had no independent recollection regarding the shooting and that she "was simply telling Detective Slaughter the story she had been told from other people about what happened."

Upon review of Ms. Orr's recorded statement, we conclude that she was not simply recounting what other people told her in regards to the key elements of her statement. Ms. Orr emphasized that she had seen Defendant, not simply heard that he was the individual who shot her, and Detective Slaughter specifically asked her about her basis for knowledge. Ms. Orr stated that she saw Defendant draw the gun and pull the trigger. She said that she was "one hundred percent positive" that she saw the Defendant pull the gun out shoot at Mr. Wright and that she was sure that Defendant shot her. Thus, any hearsay within hearsay statements contained in the recording would have had little bearing on the trial court. The State directed the trial court's focus to that part of the statement that was inconsistent with Ms. Orr's testimony and said that it was only that portion that the State intended to play. There is no indication that the trial court gave undue weight to any part of the recorded statement it should have disregarded. Defendant is not entitled to relief on this claim.

---

("because the statement was cumulative of proof already in the record, if the trial court had erred when allowing the statement to be read into evidence, the error would be harmless"), *no perm. app. filed.*

*d. Sufficiency of other proof*

Finally, as noted by the State, Ms. Orr's testimony at the probation revocation hearing that Defendant shot her was sufficient, "standing on its own, and viewed in the light most favorable to the State, to allow the trial court to make a conscientious and intelligent judgment." Ms. Orr's hearing testimony provided substantial evidence of a probation violation. The trial court was positioned to determine Ms. Orr's credibility, and it was entitled to resolve any question about her credibility against Defendant.

### 3. Ineffective assistance of counsel

On appeal, Defendant contends that he was denied the effective assistance of counsel at the probation revocation hearing because trial counsel failed to realize before the hearing that the State had sent to his email, months prior, color photographs used in the photographic line-up shown to Ms. Orr. Defendant asserts that trial counsel's ineffectiveness "deprived [Defendant] of his constitutionally granted right to have evidence disclosed to him prior to the probation revocation hearing[.]"

This court has previously explained how an ineffective assistance of counsel claim relates to a probation revocation hearing, as follows:

> [T]he right to counsel at a revocation of probation hearing is not guaranteed by either the Constitution of the United States or the Constitution of the State of Tennessee. Thus, the effectiveness of counsel at a revocation hearing is not a constitutional issue, except in those cases where the performance of counsel is so defective that another right which is constitutionally guaranteed at a revocation hearing is violated.

*State v. Larry Ammons*, No. W2001-00834-CCA-R3-CD, 2002 WL 1482675, at *4-5 (Tenn. Crim. App. Mar. 18, 2002) (alteration in original) (quoting *Richard Kiser v. State*, Nos. 01C01-9503-CC-00071, 01C01-9503-CC-00082, 1995 WL 715510, at *3 (Tenn. Crim. App. Dec. 6, 1995), *no perm. app. filed*), *perm. app. denied* (Tenn. Sept. 23, 2002). Even if a defendant can show deficient performance, he must still show prejudice. *See State v. David W. Sonnemaker*, No. E2003-01402-CCA-R3-CD, 2004 WL 483239, at *3 (Tenn. Crim. App. Mar. 12, 2004) ("The Defendant admitted his failure to submit to DNA testing and could not, therefore, have been prejudiced by counsel's deficient performance in not reading the [probation] violation report."), *perm. app. denied* (Tenn. Oct. 11, 2004).

Here, Defendant has failed to show that trial counsel's performance was deficient. Trial counsel explained that he had seen "dark copies" of the photographs used in the

photographic line-up prior to the probation revocation hearing. Although trial counsel failed to realize that an email from the prosecutor containing the color version of the photographs went to his spam email folder, trial counsel made the discovery during the first day of the probation revocation hearing. Before taking a recess, the trial court instructed the State to provide Defendant with a copy of the color photographs. Thus, Defendant was not denied the opportunity to see the proof against him.

Additionally, Defendant has failed to show that the result of the proceedings would have been different if trial counsel had seen the color photographs sooner. The record does not contain either the color photographs or the "dark copies" first seen by trial counsel. Thus, we are unable to conclude that Defendant was prejudiced by counsel's alleged deficiency. Defendant is not entitled to relief on this claim.

## Conclusion

Based on the aforementioned reasons, we affirm the trial court's decision to fully revoke Defendant's probation.

_____
ROBERT L. HOLLOWAY, JR., JUDGE