IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 24, 2019

**STATE OF TENNESSEE v. JOHNTHONY K. WALKER**

**Appeal from the Criminal Court for Hamilton County**
**No. 302476   Don W. Poole, Judge**

_____

**No. E2018-00936-CCA-R3-CD**

_____

Defendant, Johnthony K. Walker, was convicted of six counts of criminally negligent homicide, eleven counts of reckless aggravated assault, seven counts of assault, one count of reckless endangerment, one count of reckless driving, and one count of the use of a portable electronic device by a school bus driver after a school bus he was driving crashed leaving six children dead and numerous other children injured. The trial court sentenced Defendant to an effective sentence of four years for the convictions and denied judicial diversion after a sentencing hearing. On appeal, Defendant argues that the trial court improperly denied judicial diversion and/or an alternative sentence. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Amanda B. Dunn, Chattanooga, Tennessee, for the appellant, Johnthony K. Walker.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Neal Pinkston, District Attorney General; and Crystle Carrion, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On November 21, 2016, Defendant was the driver of bus 366 at Woodmore Elementary School. After school that day, Defendant picked up thirty-seven elementary school children between the ages of five and eleven. At approximately 3:20 p.m., a call to 911 reported a crash involving the bus on Talley Road near the intersection with

Sunset Avenue. As a result of the crash, six children were killed and more than twenty other children were injured. Defendant was indicted by the Hamilton County Grand Jury for six counts of vehicular homicide, seventeen counts of reckless aggravated assault, seven counts of assault, one count of reckless endangerment, one count of reckless driving, and one count of the use of a portable electronic device by a school bus driver.

*Trial*

Although Defendant does not challenge the sufficiency of the evidence supporting his convictions on appeal, the facts underlying the convictions are relevant to our determination of the issues. At the time of the accident, Defendant was working two jobs—he drove a school bus and worked at Amazon. On the day of the accident, Defendant picked up thirty-seven children at Woodmore Elementary and started his route, which included a stretch of Talley Road. Talley Road was described as a narrow, two-lane, residential street with a speed limit of thirty miles per hour. While Defendant was driving the school bus, at 3:17 p.m., Takisha Nixon called Defendant on his cell phone. Ms. Nixon worked with Defendant at Amazon. Defendant answered the phone via his Bluetooth earpiece. Ms. Nixon asked Defendant if he was driving. When he said, "Yes," she told him to be careful and hung up. She recalled that their conversation was short, but phone records indicated that the call lasted for three minutes and 50 seconds. Ms. Nixon did not hear children in the background during the call and did not hear a crash occur. Defendant claimed that the call lasted seven to ten seconds but explained that he did not hang up at the conclusion of the call because he assumed Ms. Nixon would hang up. Ms. Nixon sent Defendant several text messages after the call. The first text message, sent at 3:21:59 p.m. read, "Text me if you want to talk, whenever you're done, I'm getting back in the bed." A second text message, sent at 5:40 p.m., asked, "Are you still busy, babe?" Defendant did not respond to either text message.

Ann Jones Pierre, a longtime resident of the area, described Talley Road as a "winding road" with "some dips in it." She explained that the road was "narrow and curvy" with no shoulder and turns that "are hard to maneuver because of the way the road is" designed. On the day of the accident, Ms. Pierre picked up her great-granddaughter from Woodmore Elementary and drove toward Brainerd Road, coming to a stop at the intersection of Midland Pike and Talley Road. When she reached the intersection, bus 366 was to her right. Ms. Pierre motioned for the bus to turn onto Talley Road first, and she followed behind it. She thought that the bus "left the stop sign a little fast" as it turned onto Talley Road. Ms. Pierre followed the bus down Talley Road for a bit but lost sight of the bus as it "went over the rise" after Gayle Drive. She did not see the bus again until it was near the intersection of Talley Road and Sunset Avenue. As Ms. Pierre "came down the rise," she saw a "cloud of dirt in the air" and what she thought was fire. She soon realized that what she saw was the "bus in the yard" of a house on the left-hand side of Sunset Avenue. The bus was "tipped to the left" and "crumpled on the right

side." There was a black mailbox across the street that was "bent back toward the direction from which the bus came" and a broken electric pole. Ms. Pierre called 911 as she approached the scene of the accident. She saw Defendant get out of the bus and open one of the side doors. She stayed on the scene of the accident for about an hour and a half, during which she filled out an accident report indicating that the bus "went to the right side and veered to the left and slid left." Ms. Pierre did not include in her accident report that the bus accelerated quickly away from the stop sign. Ms. Pierre was not contacted further by police after filling out the accident report.

Michelle Brogdon, who lived on Howard Circle near the intersection of Talley Road and Sunset Avenue, was working in her yard on the day of the accident. She "heard a bunch of kids, coming from the opposite side of Talley Road, . . . and it was a little odd because of the time of day, there's usually not a lot of kid traffic." She walked toward the intersection of Talley Road and heard kids "squealing." She thought that the kids were "squealing" because of the "little dips" on Talley Road. She saw bus 366 as it "zipped by." In her opinion, the bus was speeding. She saw the bus enter an "awkward" curve and noticed that the back of the bus "kind of swiveled a little bit." As the bus went around the curve "there was another vehicle that was coming toward him." She described the other vehicle as a "little white" bus. Ms. Brogdon explained that the white bus was "mountain driving" or "cutting off a corner" and actually driving in the other lane of traffic as it approached the school bus. Soon thereafter, the bus crash occurred. After the school bus crashed, Ms. Brogdon saw the white bus pull over near Howard Street and park. Ms. Brogdon called 911 and ran to the accident scene to help children get out of the bus. Defendant was "sitting on the top of the bus" trying to get children out of the bus. Ms. Brogdon eventually gave statements to the police and to the "NTSB," the National Transportation Safety Board.

Officer Adam Cavitt of the Chattanooga Police Department was the lead investigator on the crash from the traffic division. He obtained video camera footage from the bus. There were three video cameras on the bus—a front camera, pointed toward the rear of the bus; a camera above the driver's head, pointed toward the right side of the bus where the double-swing doors are located; and a rear camera, pointed toward the front of the bus. From the footage, it appears that Defendant has a cell phone in his hand as children are entering the bus at the school. Defendant maintains the phone in his hand as the bus departs the school. According to the investigation, it was determined that the crash occurred at 3:20 p.m. Officer Cavitt observed that immediately prior to the crash, a white vehicle is seen on the video going the opposite direction. Surveillance video from a Sonic Drive-in, located on Brainerd Road facing Talley Road, showed a white bus travelling in that direction at approximately 3:09 p.m. Further investigation, including an interview of Ms. Brogdon, did not result in any additional information about or identification of the white bus seen in the video from the bus or the restaurant.

Investigator Joe Warren of the Chattanooga Police Department testified as an expert in the area of accident reconstruction. He reconstructed the accident based on observations and measurements made at the accident scene. Once on the scene, he observed "critical speed scuff marks or critical speed yaw marks" in the road leading to the utility pole. He described these marks as the type made by tires based on driving activity. The marks were "curved instead of straight," leading Investigator to believe that the bus was "out of control, sliding sideways" immediately prior to impact. Based on measurements taken from the crash scene, Investigator Warren opined that the bus lost control at the intersection of Sunset Avenue and Talley Road and that Defendant tried to steer to the right to maintain the lane of travel. The bus then went into the ditch on the right side of the roadway, and Defendant tried to steer to the left to get the bus back onto the road. According to Investigator Warren, when the bus came out of the ditch and back into the road, it was "totally out of control." The bus clipped the black mailbox on the left hand side of the road with the back end of the bus, crossed the road, and began to overturn when it struck a utility pole before finally slamming into a tree. Investigator Warren opined that the bus was travelling between 46 and 51 miles per hour at the bottom of the hill and between 44 and 45 miles per hour at the scene of the crash. Investigator Warren determined that the bus was involved in a single-vehicle crash based on the absence of paint transfer from another vehicle onto the bus and/or any other evidence that another vehicle influenced the crash sequence. He explained:

> When I reviewed video evidence, got speed from the video, when I got speed from the yaw marks and all these other things, you know, I still have a bus that's speeding and out of control and it just helps me understand . . . why he might have steered so hard to try and maintain his lane, because he saw there's a car coming and he wanted to try to stay on his side of the road, when he could have borrowed from the other side, at the speed he was going, to negotiate that curve safely and get through the curve without . . . losing control, but he wasn't able to do that because of his excessive speed. So, . . . I guess because he saw there was a white vehicle coming, he probably didn't want to hit the white vehicle head-on, so that would explain why he steered so hard to try and stay on his side of the road instead of drifting into oncoming traffic.

Defendant, on the other hand, claimed that he was driving 35 miles per hour when he reached the crest of the hill before the intersection of Talley Road and Rogers Avenue. He explained that Talley Road was "really curvy" and narrow and that he braked "periodically throughout the distance between Talley and Rogers and Sunset, before the actual accident." Defendant saw a "white transit" van coming toward him. The white van was a little over the center line, and Defendant chose to "veer out of the way" in order to avoid a collision. The bus went off the road when he veered to the right, so he "veered back to the left, and [he] figured] . . . [the bus] was back on the road at that

- 4 -

point." Defendant recalled that the "bus started to tilt and then went into . . . a pivot, and the bus landed on its side and slid and came to a stop." When he "came to," his "arms were locked . . . on the steering wheel," and his foot was on the accelerator. He immediately turned the engine off, unstrapped his seatbelt, exited the bus, and tried to "get Siri to call the cops." He saw a bystander and told them to call the police. Defendant then began to assist getting children off the bus.

A post-crash safety inspection of the bus did not reveal any safety defects in the bus that could have caused the crash. All six children who died in the crash were determined to have died as a result of injuries consistent with those sustained in a collision or crash.

At the conclusion of the jury trial, Defendant was convicted of six counts of criminally negligent homicide, eleven counts of reckless aggravated assault, seven counts of assault, one count of reckless endangerment, one count of reckless driving, and one count of the use of a portable electronic device by a school bus driver.

*Sentencing Hearing*

At the sentencing hearing, Diamond Brown, the mother of one of the deceased victims of the crash, testified. She forgave Defendant for his actions but expressed extreme agony and pain over the loss of her son. Jasmine Mateen, the mother of three children who were riding the bus on the day of the accident, testified that one of her daughters died in the crash. The other two daughters suffered possible traumatic brain injuries and continued to be emotionally affected by the accident. Ms. Mateen explained that prior to the accident, she wrote a letter and made telephone calls to the school reporting Defendant's dangerous driving. She claimed that "[n]othing happened" as a result of her efforts to report Defendant's driving. Misty Nash, the mother of two of the children on the bus, also testified at the hearing. Her daughter died in the crash and her son suffered a broken arm, concussion, was required to have a temporary chest tube, and sustained bruises from the crash. Ms. Nash expressed forgiveness toward Defendant and explained that, in her opinion, Defendant was "just a baby" who needed counseling. She acknowledged that sending Defendant to prison for a long period of time would not "bring [her] child back."

Cathy Corvin, a facilities manager for Durham School Service, the company who employed the bus drivers, explained that Defendant initially began work as a floor tech. She described Defendant as a "very nice young man, very respectful." She recalled that Defendant came to work on a skateboard because he did not have a car. He was "dependable and responsible," doing his job with "very little supervision." Eventually, Defendant fulfilled the requirements for becoming a bus driver and accepted a day position as a bus driver.

Defendant himself offered an allocution at the sentencing hearing that he "didn't wake up intending for any of this to happen to anybody" and that the results of his actions were "something that [he had] to deal with for the rest of [his] life, whether in prison or out." Defendant apologized to the families of the victims "for taking the lights out of [their] lives and how it has impacted everybody." He expressed his regret for the accident.

The defense asked the trial court to consider the evidence from the hearing on the motion for bond reduction in addition to the evidence from the sentencing hearing when making a determination as to judicial diversion. At the bond hearing, Annette Mathis, a family friend, testified that Defendant was a high school graduate and father. She explained that Defendant was responsible and reliable, and that he used a skateboard to get to work. Jim Mathis confirmed his wife's testimony, describing Defendant as a responsible person who had not been in trouble prior to the accident. Other witnesses testified about Defendant's consistent employment and lack of prior criminal convictions.

After hearing the testimony at the sentencing hearing, the trial court noted that Defendant was originally indicted on thirty-four separate counts but that one count was dismissed prior to trial. The trial court explained that Defendant was ultimately found guilty of six counts of criminally negligent homicide, a Class E felony; eleven counts of reckless aggravated assault, a Class D felony; seven counts of assault, a Class A misdemeanor; one count of felony reckless endangerment, a Class E felony; and one count of the use of a portable electronic device by a school bus driver while the bus was loading or unloading, a Class A misdemeanor.

Defendant was sentenced as a Range I, standard offender to two years on each criminally negligent homicide conviction, four years for each reckless aggravated assault conviction, eleven months and twenty-nine days on each assault conviction, two years for the reckless endangerment conviction, six months for the reckless driving conviction, and thirty days for the conviction for the use of a portable electronic device by a bus driver. All of the sentences were ordered to be served concurrently. The trial court denied judicial diversion and alternative sentencing, ordering Defendant to serve the sentences in incarceration.

Defendant filed a timely notice of appeal. On appeal, Defendant challenges the denial of judicial diversion and/or an alternative sentence.

*Analysis*

When a defendant challenges the length or manner of service of a within-range sentence, this Court reviews the trial court's sentencing decision under an abuse of

discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707. A trial court abuses its discretion in sentencing when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). This deferential standard does not permit an appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The defendant bears the burden of proving that the sentence is improper. T.C.A. § 40-35-101, Sentencing Comm'n Cmts.

## I. Denial of Judicial Diversion

Defendant first argues that the trial court erred in denying judicial diversion where the trial court found that "all of the [*State v.*] *Electroplating*[*, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998)], factors were in favor of [Defendant], but that the deaths and severity of injuries resulting from the crime were sufficient to deny diversion." The State disagrees, insisting that the trial court's sentencing determination was "reasonable and supported by substantial evidence."

Judicial diversion is a form of probation that affords certain qualified defendants the opportunity to avoid a permanent criminal record. *See* T.C.A. § 40-35-313(a)(1)(A). "Judicial diversion is a form of 'legislative largess' available to qualified defendants who have entered a guilty or nolo contendere plea or have been found guilty of an offense without the entry of a judgment of guilt." *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014). If a defendant qualifies for judicial diversion, a trial court may defer proceedings without entering a judgment of guilt, placing the defendant on probation without categorizing the defendant as a convicted felon. *Id.* Upon successful completion of the probationary period, the trial court will dismiss the charges, and the defendant may seek expungement of the record, which "restore[s] the person, in the contemplation of the law, to the status the person occupied before such arrest or indictment or information." *King*, 432 S.W.3d at 323 (quoting *State v. Schindler*, 986 S.W.2d 209, 211 (Tenn. 1999)); *see* T.C.A. § 40-35-313(a)(2), (b). However, if the defendant violates the terms of his or her probation, "the court may enter an adjudication of guilt and proceed as otherwise provided." T.C.A. § 40-35-313(a)(2).

A defendant is eligible for judicial diversion if he or she is found guilty or pleads guilty or nolo contendere to a Class C, D, or E felony, has not been previously convicted of a felony or Class A misdemeanor, has not been previously granted judicial or pretrial diversion, and is not seeking deferral for a sexual offense. *See* T.C.A. § 40-35-

313(a)(1)(B)(i). "Eligibility under the statute does not, however, constitute entitlement to judicial diversion; instead, the decision of whether to grant or deny judicial diversion is entrusted to the discretion of the trial court." *King*, 432 S.W.3d at 323. The trial court must consider several common law factors:

'(a) The accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as others. The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused.'

*Id*. at 326 (quoting *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)). "[T]he trial court must weigh the factors against each other and place an explanation of its ruling on the record." *Id*. (citing *Electroplating, Inc.*, 990 S.W.2d at 229).

When the trial court considers the common law factors, "specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion," then this Court will "apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." *Id*. at 327. Our supreme court has explained:

Although the trial court is not required to recite all of the *Parker* and *Electroplating* factors when justifying its decision on the record in order to obtain the presumption of reasonableness, the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case before it. Thereafter, the trial court may proceed to solely address the relevant factors.

*Id*. Failure to consider the common law factors results in a loss of the presumption of reasonableness, and this Court will either conduct a de novo review or remand the case to the trial court for reconsideration. *Id*. A trial court can also abuse its discretion by considering and placing undue weight on an irrelevant factor. *See State v. Chyanne Elizabeth Gobble*, No. E2014-01596-CCA-R3-CD, 2015 WL 12978645, at *6 (Tenn. Crim. App. Aug. 12, 2015), *no perm. app. filed*.

At the sentencing hearing, the State introduced the presentence report, which indicated that Defendant was twenty-five years of age, had graduated from high school, and had taken classes at Chattanooga State Community College for almost one semester. Defendant reported that he could not afford to continue with college classes. Defendant provided a fairly extensive family history in preparation of the presentence report, during

which he explained that he grew up in a single-parent household. Defendant reported that he maintained a close relationship with two siblings and a bevy of uncles, aunts, and cousins. Prior to the accident, Defendant lived with his girlfriend, the mother of his four-year-old son. At the time of the hearing, Defendant lived with his aunt, a teacher. Defendant maintained a relationship with his son and saw him two to three times a week. Defendant was employed by Durham School Service as a bus driver and by Amazon as a warehouse associate at the time of the accident. Defendant had no prior convictions.

The presentence report included victim impact statements from relatives of several of the victims. The impact statements detailed the various injuries of the victims, which ranged from cuts and bruises to death. The impact statements indicated the profound and lasting impact of the crash on the survivors of the crash, many of whom continued to have nightmares and suffer long-term emotional distress. Additionally, several of the victims had long-term health complications, including one child who lost a limb in the crash. The impact statements detailed the undeniable and unimaginable pain and suffering of the families whose children perished in the crash.

Prior to imposing a sentence, the trial court explained that crafting a sentence for each case that came before the court was "hard" but that "[s]ome cases are particularly harder than others." Prior to fashioning the length of the sentence for each conviction, the trial court noted that it was considering the guidelines set forth in Tennessee Code Annotated section 40-35-103, including the evidence at the trial and sentencing hearing, the presentence report, the testimony at the bond hearing, Defendant's allocution statement, the nature of the criminal conduct, the evidence with regard to mitigating and enhancement factors, Defendant's potential for rehabilitation, and Defendant's background.

The trial court determined that Defendant was a Range I, standard offender with no prior criminal record. The trial court determined that Defendant's employment history and his family support should be applied as mitigating factors. *See* T.C.A. § 40-35-114(13). With regard to enhancement factors, the trial court determined that Defendant had a prior history of criminal behavior based on his prior reports of speeding while driving the bus and that Defendant abused a position of private trust. *See* T.C.A. § 40-35-114(1), (14). As a result, the trial court sentenced Defendant to two years for each criminally negligent homicide conviction, four years for each reckless aggravated assault conviction, eleven months and twenty-nine days for each assault conviction, two years for the reckless endangerment conviction, six months for the reckless driving conviction, and thirty days for the conviction for the use of an electronic device. The sentences were ordered to be served concurrently, for a total effective sentence of four years.

After fashioning the length of Defendant's sentences with regard to each conviction, the trial court first considered judicial diversion, making specific findings

with regard to each of the *Electoplating* factors. As to Defendant's amenability to correction, the trial court noted that this favor weighed "strongly in favor" of Defendant because he had no criminal record and his behavior while on bond was "exemplary." When looking at the circumstances of the offense, the trial court noted that "a death, in and of itself, is not a basis to deny diversion." The trial court explained that it had reviewed several cases with regard to the application of this factor and concluded that the circumstances of the offense weighed "somewhat against" Defendant. The trial court noted Defendant had "absolutely no criminal record," indicating this factor weighed "strongly" in favor of diversion. Likewise, Defendant's social history also weighed strongly in Defendant's favor. The trial court made sure to note that Defendant "always worked, . . . supported his family, [had] never been in trouble as an adult or juvenile, completed high school, [and] started college" even though he eventually dropped out of college. The trial court next examined Defendant's mental and physical health, and determined this factor was neutral, weighing neither for nor against Defendant, because Defendant had suffered from depression as a result of the incident at issue. With regard to deterrence, the trial court noted a lack of proof with regard to the deterrent value of incarceration, so the trial court placed this factor in favor of Defendant. Lastly, when considering whether judicial diversion would serve the ends of justice, the interests of the public as well as the accused, the trial court commented that if this was "the sole factor to deny diversion, the offense, as committed, must be especially violent, horrifying, shocking, reprehensible, offensive, or excessive or exaggerated, and the nature of the offense, the criminal conduct itself, must outweigh all other factors that would dictate deferred prosecution." The trial court determined that in Defendant's case, this factor "outweighs all of the other factors, most of which are in the favor of [Defendant] getting deferred prosecution." In the trial court's words:

> [S]eldom has a case come before this Court that [was] so shocking, so violent, so reprehensible: Six deaths of little children, very, very serious injuries for some of the other children. Not a great deal has been mentioned of this other than the trial itself, but some of the children suffering brain damage, one of the children suffering a loss of [an] arm. So I think that the offense itself would dictate that the diversion should not be granted.

Defendant argues on appeal that the trial court improperly relied on "the loss of life that occurred, and the number of injuries to those children that survived the crash" in denying diversion without finding that the offenses were shocking, violent, and reprehensible. This Court has previously held that a trial court may not rest its decision to deny judicial diversion to a qualified defendant *solely* on the grounds that a victim died due to the defendant's crime. *See State v. Jared Booth Spang*, No. M2014-00468-CCA-R3-CD, 2015 WL 510921, at *4 (Tenn. Crim. App. Feb. 6, 2015) (holding that "[d]eath is always permanent in a homicide case and cannot be considered as a factor for denying

- 10 -

diversion" but that "the circumstance leading to death can be considered"), *no perm. app. filed*; *State v. Teresa Turner*, No. M2013-00827-CCA-R3-CD, 2014 WL 310388, at *6 (Tenn. Crim. App. Jan. 29, 2014) (holding that the trial court abused its discretion when it "denied judicial diversion solely because a death was involved" and "did not review all of the relevant factors"), *no perm. app. filed*. However, the Court has also upheld the denial of judicial diversion "based solely on the nature and circumstances of the offense, so long as all of the other relevant factors have been considered, and this factor outweighs all others that might favorably reflect on the [d]efendant's eligibility." *State v. George William King*, No. M2001-02026-CCA-R3-CD, 2002 WL 31520648, at *4 (Tenn. Crim. App. Nov. 13, 2001) (citing *State v. Curry*, 988 S.W.2d 153, 158 (Tenn. 1999)), *no perm. app. filed*; *see also State v. Wendi Hope Tunny*, No. E2014-02502-CCA-R3-CD, 2016 WL 3209428, at *5 (Tenn. Crim. App. June 1, 2016) (concluding that there was substantial evidence in the record to support the trial court's decision to deny diversion where trial court based denial solely on the nature and circumstances of the offense but considered all the other relevant factors as well), *no perm. app. filed*; *State v. Finch*, 465 S.W.3d 584, 610 (Tenn. Crim. App. 2013) (determining trial court did not abuse its discretion in denying diversion where trial court found circumstances of the offense and deterrence value to others outweighed other factors, even where trial court relied heavily on the fact that the defendant abused a position of public trust).

Defendant relies heavily on *State v. Sherry Ann Claffey*, No. W2016-00356-CCA-R3-CD, 2016 WL 7239018, at *1 (Tenn. Crim. App. Aug. 2, 2016), *no perm. app. filed*, to support his argument that the trial court erred by considering the nature and circumstances of the offense in denying diversion. In *Sherry Ann Claffey*, the defendant entered a no contest plea to two counts of vehicular homicide as a result of reckless conduct. In denying diversion, the trial court based its decision on the defendant's use of prescription drugs, the circumstances of the offense, and a determination that "judicial diversion would not serve the ends of justice where two people lost their life." *Id.* at *6. On review, this Court noted that the trial court "failed to identify any reasons why or explain how the circumstances of the offenses weighed against diversion." *Id.* Moreover, this Court determined that the trial court improperly considered Defendant's prescription drug use as "irrelevant evidence" in denying diversion. *Id.* As a result, this Court conducted a de novo review and ultimately concluded that the defendant should be placed on judicial diversion. *Id.* at *8.

Here, the trial court engaged in a very detailed and thorough examination of the *Electroplating* factors prior to denying diversion primarily on the basis of the circumstances of the offense. Because the trial court properly identified and weighed the *Electroplating* factors, we afford the trial court's decision to deny judicial diversion a presumption of reasonableness and assess whether there was any substantial evidence in the record to support that decision. *King,* 432 S.W.3d at 327; *Parker,* 932 S.W.2d at 958. After our review, we determine that there was substantial evidence in the record to

support the denial of diversion. While Defendant was certainly amenable to correction, as evidenced by his employment record, non-existent criminal record, good physical and mental health, and positive social history, it was within the trial court's discretion to conclude that the circumstances of the offense outweighed the factors in favor of diversion. There is no denying the emotional nature of the deaths and injuries resulting from Defendant's actions and the lasting effects on the children and their families. Defendant was entrusted with driving a school bus filled with thirty-seven elementary school-aged children. While doing so, he used his phone and exceeded the speed limit on a narrow, winding road before losing control of the bus, which slammed in to a utility pole and came to a stop on its side against a tree. As a result of the crash, six children died and at least twenty-two other children suffered physical injuries ranging from bruises to severed limbs. These facts are tragic for all involved. But these facts are nonetheless horrifying. The trial court did not abuse its discretion in denying judicial diversion. Defendant is not entitled to relief on this issue.

## II. Alternative Sentence

Defendant also argues that the trial court erred by denying Defendant's request for an alternative sentence. The State disagrees. A defendant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. *See* T.C.A. § 40-35-303(a). Moreover, a defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. *See* T.C.A. § 40-35-102(6). Defendant was convicted of Class D and E felonies and several misdemeanors and was sentenced to an effective sentence of four years. Defendant was eligible for probation based on the length of his sentence and the fact that he was a standard offender.

Although the trial court is required to automatically consider probation as a sentencing option, *see* Tennessee Code Annotated section 40-35-303(b), no criminal defendant is automatically entitled to probation as a matter of law, *see State v. Davis*, 940 S.W.2d 558, 559 (Tenn. 1997). It is the defendant's burden to establish his or her suitability for full probation. *See Carter*, 254 S.W.3d at 347 (citing T.C.A. § 40-35-303(b)). The defendant must demonstrate that probation will "subserve the ends of justice and the best interests of both the public and the defendant." *Hooper v. State*, 297 S.W.2d 78, 81 (Tenn. 1956), *overruled on other grounds*, *State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000). Among the factors applicable to probation consideration are the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect upon the defendant; and the best interests of the defendant and the public. *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978). Tennessee Code Annotated section 40-35-103(1) sets forth the following sentencing considerations, which are utilized in determining the appropriateness of alternative sentencing:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

*See also State v. Zeolia*, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. T.C.A. § 40-35-102(5). Our supreme court has specifically held that the abuse of discretion standard, with a presumption of reasonableness, also applies to a review of a denial of alternative sentencing. *Caudle*, 388 S.W.3d at 278-79.

Here, the trial court determined that Defendant had good potential for rehabilitation but that a sentence of full probation would depreciate the seriousness of the offense. The trial court laboriously examined each factor to be considered in sentencing prior to denying probation, noting specifically the tragedy of the accident. The trial court did not abuse its discretion in denying an alternative sentence. Defendant is not entitled to relief.

*Conclusion*

Based on the foregoing, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE